Hamilton E. HOLMES, a minor, by his father and next friend, Alfred Holmes, and Charlayne A. Hunter, a minor by her mother and next friend, Mrs. Althea Brown Hunter, on behalf of themselves and others similarly situated, Plaintiffs,

v.

Walter N. DANNER, Registrar of the University of Georgia, Defendant.

Civ. A. No. 450.

United States District Court
M. D. Georgia,
Athens Division.

Order and Opinion Granting Permanent Injunction Jan. 6, 1961.

Granting Stay of Court's Order
Jan. 9, 1961.

Restraining Order Granted Jan. 10, 1961.

Temporary Injunction
Jan. 12 and 13, 1961.

D. L. Hollowell, Horace T. Ward, Atlanta, Ga., Constance B. Motley, New York City, for plaintiffs.

Eugene Cook, Atty. Gen., B. D. Murphy, Atlanta, Ga., E. Freeman Leverett, Elberton, Ga., James Therrell, Atlanta, Ga., for defendant.

BOOTLE, District Judge.

Granting Permanent Injunction after Full and Final Trial.

Following a hearing on plaintiffs' motion for a preliminary injunction in the above-styled action, this court filed its memorandum opinion, 191 F.Supp. 385, including findings of fact and conclusions of law, on September 25, 1960 denying said motion for preliminary injunction. That memorandum fully sets forth plaintiffs' contentions and makes specific findings of fact regarding plaintiffs' applications and the action taken with respect to those applications on appeal through administrative channels prior to September 14, 1960. That memorandum and its findings of fact and conclusions of law are incorporated herein and made a part hereof by this reference thereto.

Since the filing of the court's memorandum on September 25, 1960, a full and final trial lasting four and one-half days has been held, the record of that trial has been transcribed and made available to the court, and counsel for both sides have submitted exhaustive briefs, and the court has carefully considered the record of the trial and the evidence adduced thereat, together with the briefs and affidavits submitted by each side. This memorandum opinion is intended to comply with the requirements of Fed.R. Civ.P. 52, 28 U.S.C.A., relative to the court's findings of fact and conclusions of law.

At a pre-trial conference, held on November 18, 1960, prior to the full and final trial of this action, plaintiffs filed an amended complaint correcting "certain typographical errors apparent on the face" of the original complaint, alleging additional facts allegedly evidencing discrimination, and dismissing Paul Kea, assistant director of admissions, University of Georgia, as a party defendant, but making no "substantive change in the original cause of action."

In his answer to the amended complaint defendant denies the material allegations of plaintiffs' complaint and denies generally "the existence of any policy, practice or custom of limiting admission to the University of Georgia to white persons" and that "plaintiffs were excluded because of their race or color." Defendant also contends that plaintiffs have failed to exhaust their administrative remedies and that their action should therefore be dismissed.

While the complaint in this law suit seeks, as its objective, results never heretofore existent in this state, nonetheless, the problem, procedure and routine here, as in all law suits, must be and are the ascertainment of the law, the determination of the facts, and the application of the one to the other. The basic law applicable here is now generally known and, in fact, is not in dispute in this case. Simply stated, it is that any citizen of the State of Georgia applying for admission as a student to any public, tax-supported college or university of the State, if otherwise qualified, cannot be denied admission solely because of his race or color. Lucy v. Adams, D.C.N.D. Ala.1955, 134 F.Supp. 235, affirmed 5 Cir., 228 F.2d 619; Sweatt v. Painter, 1950, 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114; Brown v. Board of Education, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873; Hunt v. Arnold, D.C.N.D.Ga.1959, 172 F.Supp. 847. Able counsel for defendant make no contention that plaintiffs should not be admitted to the University of Georgia if they are qualified and comply with admission procedures, and if facilities are available. Therefore, the court is presented with the precise issue of whether defendant has de-

nied plaintiffs admission to University of Georgia solely because of their race or color.

### Action in re Applications Since September 14, 1960.

Following the order of this court filed September 25, 1960 refusing plaintiffs' prayer for preliminary injunction, the Board of Regents of the University System of Georgia met on October 21, 1960, and adopted the following report of its committee on education:

"The Committee on Education has carefully considered the appeals of Charlayne A. Hunter and Hamilton E. Holmes, applicants for admission to the University of Georgia.

"From its examination of the records relating to these applicants, the Committee is of the opinion that they failed to complete the required procedures, and that consequently the University authorities have been in no position to consider their applications. The appeals from the Director of Admissions were taken before that official had made, or had opportunity to make, any decision, and were apparently premature.

"Accordingly, treating the appeals of Charlayne A. Hunter and Hamilton E. Holmes as properly before the Board of Regents, the Committee on Education recommends that they be denied, but without projudice [sic] to the rights of the applicants to renew and pursue their applications."

This information was conveyed to plaintiffs by the Board by letter dated October 21, 1960.

Thereafter, defendant, together with Assistant Registrar Paul Kea and Admissions Counselor Morris Phelps, conducted a personal interview of plaintiff Hunter on November 5, 1960 and of plaintiff Holmes on November 18, 1960. On November 29, 1960 defendant wrote plaintiff Hunter as follows:

"You indicated in your interview on November 5, 1960, that you desired to transfer to the University of Georgia as soon as possible. You also stated that you were now attending Wayne State University in Detroit, Michigan.

"I would like to confirm my statement to you that for the Winter and Spring Quarters of 1961 we are accepting students only within the same categories as we did last Winter and Spring. It might be that some applicants who come within these categories cannot be accepted due to limited facilities.

"We will begin after April 1, 1961, considering transfers for the 1961 Fall Quarter. A transcript through the first semester or the first two quarters of 1960–61 is a prerequisite for consideration.

"We will consider you, along with other applicants, for the 1961 Fall Quarter if it is your desire to transfer."

Also on November 29, 1960 defendant addressed the following letter to plaintiff Holmes:

"When you were in our office for your personal interview on November 18, I advised you that we could not consider your application for the Winter or Spring Quarters of 1961 as we are accepting students only within the same categories as we did last Winter and Spring.

"From a review of your records and on the basis of your personal interview, we are of the opinion that you do not qualify as a suitable applicant to the University of Georgia and you are hereby denied admission.

"We regret that we are unable to accomodate [sic] you in your request."

At the time of the trial neither plaintiff had been accepted for admission, plaintiff Holmes having been "denied admission" and plaintiff Hunter not having been considered for admission "due to limited facilities."

## Failure to Exhaust Administrative Remedies.

Defendant contends that the present action should be dismissed because plaintiffs have failed to exhaust their administrative remedies. More specifically, defendant contends that plaintiffs have failed to comply with the provisions of a regulation governing appeals "from denial of admission to any unit of the University System of Georgia" adopted by the Board of Regents on November 8, 1950.[1] Plaintiffs admit their failure to follow the administrative appellate procedure set out in the regulation of the Board of Regents, but contend, inter alia, that the administrative remedy created by that regulation is inadequate.

It would seem appropriate at this point to consider the Georgia law which forms the background against which administrative officials must act in considering an appeal by a Negro applicant from denial of admission to a unit of the University System of Georgia.

The General Appropriations Act of 1956, Ga.Laws 1956, Vol. I, p. 753 et seq., after making an appropriation for the benefit of the State Board of Regents and the University System in Section 8, contains the following provisions:

"Section 8. (a)

\* \* \* \* \* \*

"Provided, further, that (a) the appropriations made in this Section 8 for the benefit of the State Board of Regents and the University System or otherwise, so far as the same relate to schools and colleges, are limited to schools and colleges providing separate education for the white and colored races, and operating in conformity to Article VIII, Section I, Paragraph I of the Constitution of this State, the General Assembly declining to appropriate funds for any school or college operating otherwise. Funds apportioned or made available under this Section 8 for the benefit of any school or college shall be deemed to be separately appropriated for the benefit of such school or college, and shall be separately subject to the limitation imposed by this subsection upon their use, which limitation shall be deemed to be a condition precedent to such appropriation. In any of the events provided by Subsection (d) said appropriation shall be null and void. \* \* \*

"(b) No part of this appropriation nor any funds realized by the State Board of Regents or the University System or any school or college from the Federal Government or from donations, gifts, earnings,

1. "Whenever an applicant for admission to any institution shall be denied admission or shall feel that his application has not been given due consideration or whenever a student shall be expelled or suspended for more than an academic year, such applicant or student shall have the right to appeal in accordance with the following procedure.

"The person aggrieved shall appeal in writing to the head of the institution within thirty days after the action of which he complains. The head of the institution shall then appoint a committee composed of three members of the faculty of the institution. This committee shall review all facts and circumstances connected with the case and shall make its findings and report thereon to the President. After consideration of the committee's report the President shall make a decision which shall be final

so far as the institution is concerned. Should the aggrieved person be dissatisfied with said decision, he shall have the right to appeal in writing to the Chancellor of the University System of Georgia who shall review the entire proceedings and make his decision thereon. His decision shall be final and binding unless the applicant or offender shall desire his case to be reviewed by the Board of Regents. An appeal to the Board of Regents shall be submitted in writing to the Executive Secretary of the Board within a period of thirty days after the Chancellor's decision and shall recite all reasons for dissatisfaction with the previous decisions. The Board or a committee of the Board shall investigate the matter thoroughly and make its decision thereon which shall be final and binding for all purposes."

fees, rents, sales or from any other source of income, shall be available for use or expenditure until made available from time to time by written order of the State Budget Authorities.

"(c) No funds appropriated by this Section 8 or derived from the sources of revenue referred to in Subsection (b) hereof, shall be used or expended for any school or college except as herein otherwise provided and in conformity to the following: The State Board of Regents, within the first thirty days of each fiscal period, shall make an apportionment of funds to the various schools and colleges in the University System or operated by the State Board of Regents or otherwise within the provisions of this Section 8, first including in such apportionment the amounts necessary in each fiscal year to pay the lease contract commitments for the acquisition of property, and upon written approval of such apportionment or any item thereof by the State Budget Authorities, the apportionment or item so approved by the State Budget Authorities shall be available for use and expenditure. The State Board of Regents shall include in such apportionment only schools and colleges available for appropriations under the provisions of Subsection (a) hereof; and the State Budget Authorities shall have power to approve only apportionments which are so limited. If after an apportionment is made to any school or college and approved by the Budget Authorities, such school or college shall cease to be operated in conformity with Subsection (a) hereof, no further funds shall be used or expended from such apportionment and the unexpended portion thereof shall be retained in the treasury.

"(d) In the event any suit is prosecuted to effective judgment of a court of competent jurisdiction against the State Board of Regents or other authorities in charge of any school or college to which this Section 8 relates or in relation to any such school or college, resulting in determination by such court that any provision of said Section 8 is unconstitutional, or that any such school or college may not be operated in conformity to Article VIII, Section I, Paragraph I of the Constitution of this State, and as provided in Subsection (a) hereof, or requiring the admission to such school or college of any person denied admission by the authorities in charge thereof, the school or college affected by such judgment shall not thereafter be included in any apportionment of the State Board of Regents nor in any order of the State Budget Authorities making funds available. If such effective judgment shall be rendered in respect of any school or college to which this Section 8 relates after an apportionment shall have been made thereto and funds made available to such school or college by the Budget Authorities, then and in such event no further funds shall be used or expended from such apportionment and the unexpended portion thereof shall be retained in the treasury. The Bureau of the Budget shall by written order determine when any such judgment has become effective.

"(e) After approval by the State Budget Authorities of any apportionment or item of apportionment made by the State Board of Regents, any and all other obligations in excess of the funds apportioned or contrary to the item or apportionment as approved or the provisions of this Section 8 shall be null and void; and the appropriations made in this Section 8 are subject to all provisions of the Constitution of this State and all budget requirements not inconsistent herewith now or hereafter of general application."

Defendant admits that the General Appropriations Act of 1956, supra, is still

in effect. However, he contends that it "does not provide for a cut-off of funds where a Negro enters a formerly all-white institution of the University System as a result of voluntary administrative action by university officials, but only in the event that a Negro enters such an institution by virtue of a court decree." To construe said Appropriations Act in accordance with defendant's contention would require the court to completely ignore the clear and plain meaning of the Act's language. The maintenance of separate schools and colleges for the white and colored races is a condition precedent to the appropriation of all funds. Even if, after an apportionment is made to any school or college, such school or college ceases to operate in conformity with the principle of maintenance of separate schools and colleges for the white and colored races, "no further funds shall be used or expended from such apportionment and the unexpended portion thereof shall be retained in the treasury." This limitation on the use of funds appropriated to a school or college appears also to extend to funds realized "from the Federal Government or from donations, gifts, earnings, fees, rents, sales or from any other source of income." Section (d) does provide for the cut-off of funds in the event that a Negro enters a formerly all-white institution by virtue of a court decree. However, other provisions, as outlined above, unequivocally require the cut-off of funds in the event that a Negro enters a formerly all-white institution whether as a result of voluntary or involuntary action or for any reason whatsoever.

Article VIII, Section I, Paragraph I of the Constitution of the State of Georgia, Ga.Code Ann. § 2–6401, referred to in the Appropriations Act, provides:

"The provision of an adequate education for the citizens shall be a primary obligation of the State of Georgia, the expense of which shall be provided for by taxation. Separate schools shall be provided for the white and colored races."

Although the Supreme Court of Georgia held in State of Georgia v. Regents of University, 1934, 179 Ga. 210, 223, 175 S.E. 567, 574, that the predecessor of Article VIII, Section I, Paragraph I did not apply to the University System, the constitutional provision at that time was:

"There shall be a thorough system of common schools for the education of children, as nearly uniform as practicable, the expense of which shall be provided for by taxation, or otherwise. The schools shall be free to all children of the State, but separate schools shall be provided for the white and colored races."

The court said that "[t]his provision applies only to 'common schools,' which schools are not a part of the university system." It should be noted that the present provision does not mention "common schools". Apparently the legislature believed that Article VIII, Section I, Paragraph I now applies to the University System since, in the above-mentioned appropriation for the University System, the language "operating in conformity to Article VIII, Section I, Paragraph I" is utilized in conjunction with "schools and colleges providing separate education for the white and colored races." It would therefore seem that the question of whether present Article VIII, Section I, Paragraph I applies to the University System is, as yet, undecided by the highest Court of Georgia. Since the provision no longer mentions "common schools", it would appear to be applicable to the University System as well as to the other public, tax-supported schools of the State.

The constitutionality of the Appropriations Act and the constitutional provision discussed above is not in issue in this case. However, in determining whether the administrative remedy provided by the Board of Regents is adequate in this case, the court must consider the "freedom" of the President of the University, the Chancellor of the University System, and the Board of Regents to admit plain-

tiff Negroes to the University of Georgia, a formerly all-white institution.

Another consideration in determining the adequacy of the administrative remedy is the time required for exhausting such remedy. The regulation creating the appellate procedure here does not require action on the appeal by the administrative official appealed to within any prescribed period of time, not even within a "reasonable" period of time. As a matter of fact, the appeal taken on June 2, 1960 from the inaction of defendant in regard to plaintiffs' applications required 122 days for exhaustion of the administrative remedy, the action by the Board of Regents having been taken on October 21, 1960, after the court had said in its order filed September 25, 1960 that "[p]resumably, the Board of Regents, unless it has already done so, will be able to act upon plaintiffs' pending appeals within thirty (30) days from the date hereof, and, in the event it should fail to do so, this court will deem said appeals denied \* \* \*."

■■ It is axiomatic that plaintiffs are not required to exhaust an administrative remedy which is inadequate. See Adkins v. School Board of City of Newport News, D.C.E.D.Va.1957, 148 F.Supp. 430. Equity does not require the doing of a useless thing. Gibson v. Board of Public Instruction of Dade County, 5 Cir., 1957, 246 F.2d 913.

■ It is the finding of this court that the administrative remedy provided by the regulation of the Board of Regents is inadequate for two reasons: 1) The regulation creating the appellate procedure here does not, at any of the three required steps of the appeal, require action on the appeal by the administrative official appealed to within any prescribed period of time, not even within a "reasonable" period of time; and 2) the administrative officials to whom appeals must be taken are not "free" to admit Negro plaintiffs to the University of Georgia in light of the provisions of the General Appropriations Act of 1956 discussed above. In this connection see Adkins v. School Board of City of Newport News, supra.

Plaintiffs have already prosecuted one appeal through administrative channels, which appeal required 122 days for final administrative action. If plaintiffs were required to appeal from defendant's failure to admit them each quarter for which they made application for admission they would probably use up the normal four-year college attendance period before securing any final administrative action. Plaintiff Hunter has not even yet been able to have her application considered by defendant, although she made a continuing application which was initially received by defendant on July 22, 1959. Plaintiff Holmes' application was finally acted upon November 28, 1960, sixteen months subsequent to the filing of his first application which he requested be considered a continuing one. With no requirement that the various administrative officials act on appeals within a prescribed period of time, plaintiffs' administrative remedy is wholly inadequate. It might be noted, collaterally, that the regulation creating the administrative remedy was adopted November 8, 1950, six weeks after the application of Horace Ward, a Negro, for admission to the University of Georgia Law School.

The court would be ignoring human experience if it were to find that the administrative officials are "free" to order the admission of plaintiffs when, apparently, the result of such admission, under the General Appropriations Act of 1956, would be to cut off the appropriation of funds for the University of Georgia. Officials acting in such a situation cannot be "free".

For the reasons heretofore stated, plaintiffs' failure to exhaust the administrative remedy will not defeat their action for the reason that the administrative remedy provided is inadequate in this case.

### Discrimination.

■ After a careful consideration of all of the evidence admitted at the trial, the court finds that, had plaintiffs been

white applicants for admission to the University of Georgia, both plaintiffs would have been admitted to the University not later than the beginning of the Fall Quarter, 1960. It is the further finding of the court that plaintiffs, citizens of the State of Georgia applying for admission as students to the University of Georgia, a public, tax-supported university of the State, are otherwise qualified, but have been denied admission solely because of their race and color. The court further finds that, although there is no written policy or rule excluding Negroes, including plaintiffs, from admission to the University on account of their race or color, there is a tacit policy to that effect, and that defendant Danner has pursued such policy in denying the plaintiffs' applications for admission. The court considers it worthwhile to discuss some of the evidence which leads it to make the findings above stated, although the discussion which follows must, in the interest of brevity, be limited to the most compelling evidence.

No Negroes have ever been enrolled at the University of Georgia, and, prior to September 29, 1950, no Negro had ever applied for admission. At the time of the trial only four Negroes, including plaintiffs, had made application for admission to the University, all on or since September 29, 1950, none of whom has yet been admitted.

### A. Other Negro Applicants.

Horace Ward, one of the attorneys of record for plaintiffs in this case, applied for admission to the University of Georgia Law School on September 29, 1950. Ward's application was referred to L. R. Siebert, Executive Secretary of the Board of Regents, for out-of-state aid.[2] Defendant later denied Ward admission "because he came from a non-accredited institution", which institution, Morehouse College, had an "A" rating by the Southern Association of Colleges and Secondary Schools although not eligible for membership in that organization at that time, being a Negro college. Ward later brought suit complaining of the denial of admission, which suit was finally dismissed by the United States District Court for the Northern District of Georgia without an adjudication of the merits of Ward's contention of discrimination. Ward v. Regents of the University System of Georgia, D.C.N.D.Ga.1957, 191 F. Supp. 491.

Ida Rose McCree, a Negro, applied for admission to the University on June 4, 1960. Dr. Morris Phelps, admissions counselor in defendant's office, on June 15, 1960, wrote Miss McCree as follows:

"Your application for admission to the University of Georgia for the fall quarter has been received.

"Our dormitory facilities for women students have been filled for several weeks and we have, therefore, been denying admission to all women students. Your $25 application deposit is returned herewith."

Plaintiffs are the only other Negroes who have made application for admission to the University, and the circumstances of their attempts to enter the University will be discussed in more detail.

### B. "Limited Facilities".

Plaintiff Hunter was informed by defendant that she could not be considered for admission for the Fall Quarter, 1959, the Winter Quarter, 1960, the Spring Quarter, 1960, the Fall Quarter, 1960, and the Winter Quarter, 1961, "due to limited facilities". Plaintiff Holmes was given the same reason for defendant's refusal to consider his application for the Fall Quarter, 1959, the Winter Quarter, 1960, and the Spring Quarter, 1960. Therefore, it seems appropriate to consider the housing situation at the University during July, 1959 and subsequently, especially since University regulations would require plaintiff Hunter, being a

---

2. The out-of-state scholarship program "offers to colored people a differential for educational work taken out of the State of Georgia * * *. [T]hat work is of a nature * * * that is given at the white institutions but not given at the Negro institutions." [Testimony of L. R. Siebert, R. 37 (Vol. I).]

female student under 23 years of age, to be housed on the campus, and would have required plaintiff Holmes to be housed on the campus during the 1959–60 academic year, he being a freshman male student at that time.

Dr. O. C. Aderhold, President of the University, addressed a letter to defendant on July 16, 1959, a part of which follows:

"It is my judgment that with no additional housing in prospect for 1959 and limited laboratory facilities in certain phases of our instructional program, that we should not accept any additional new students for admission prior to the 1960–61 academic year. We will certainly not be able to take care of all of the students who have been accepted should they all desire to enter during this academic year. It may be possible to accept some new students for the Summer of 1960. This cannot be determined, however, until you see how many of the 3,033 new students take advantage of our facilities during the academic year.

"It will probably be necessary for you to accept some students who graduate from or who need to transfer from some of the junior colleges in the University System at the beginning of the Winter and Spring Quarters of 1959–60. There will be some who will graduate from these units during the year and desire to transfer immediately to the University, and there are some who will be recommended by their presidents for transfer prior to graduation in order to get the academic program essential for continuing work toward a degree. You will recall that we have an agreement to take such junior college students who meet our admission requirements."

In this connection it might be noted that Dr. Aderhold's letter was written some weeks after plaintiffs (or some other Negroes) secured application forms from defendant's office, five days after the receipt of plaintiffs' transcripts, and

the day after their applications are dated, although the applications were marked received in defendant's office July 22, 1959.

On November 16, 1959 defendant addressed an inter-office communication to Dr. Aderhold, part of which follows:

"We have a number of applications from new students for the Winter Quarter, and I would like to list these in three categories:

"1. Transfers who need to change in order to continue their academic program.

"a. From Georgia Junior Colleges 59

"b. From Georgia Senior Colleges 15

"c. From Out-of-State Junior Colleges 3 .

"d. From Out-of-State Senior Colleges 9

"e. Those seeking another degree (Graduate) 11

"2. Freshmen who have never been to college 31 (at least 5 of whom have been in the Army for six months)

"3. Transfers desiring to make a change

"a. From Georgia Senior Colleges 26

"b. From Out-of-State Senior Colleges 13

"c. From Out-of-State Junior Colleges 1

"In your letter of July 16, 1959, you advised that we should not accept additional new students for admission prior to the 1960–61 academic year because of limited facilities. Of course, we do not know how many of our present students will return for the Winter Quarter, nor do we know how many former students will return. I am wondering, however, if the situation has changed to some extent since last summer so that we could accept applicants in any of the above cate-

gories. Of course, it is assumed that any we do accept will meet all admission requirements, including a personal interview. I would like to recommend that those in the first two categories above be admitted. There may be a few in the third group whom we should interview and determine if circumstances warrant their making a change at this time.

"I would appreciate your advice concerning this matter."

Brackets have been pencilled around categories 1 and 2, and beside the brackets are the signature "O. C. Aderhold" (apparently) and the date "11/18/1959". Dr. Aderhold testified that the above constituted the authorization for defendant to accept only students in categories 1 and 2.

On May 18, 1960 Dr. Aderhold wrote defendant:

"I have been making a study of your report submitted to me on May 15, 1960, regarding the acceptance of Students for the Fall Quarter 1960. I have also discussed limitations of our housing and other physical facilities with Dr. Williams.

"I note that you have already accepted 2503 students, with 1007 applications to be processed. In view of these facts, please do not accept any more students for the Fall Quarter 1960, except those who may need to transfer from junior colleges of the University System. I believe we have some obligation to try to find space for them. Students who apply for transfer from senior institutions can continue their education in those institutions."

On October 4, 1960 Dr. Aderhold wrote defendant:

"I have just had a conference with Dr. J. A. Williams, Dean of Students at the University. He reports that we have registered 7475 students. This is 540 more than a year ago.

"Dr. Williams also reports that housing is overtaxed and that many students are living this quarter in recreation rooms and study halls.

"I would like to request that you not admit students during the winter and spring quarters except those falling into the same categories as you accepted during the fall and spring quarters of 1959-60. These categories were approved November 16, 1959."

Dr. Aderhold testified at the trial that he meant winter instead of fall in the fourth from the last line of the above letter. He also apparently meant November 18 instead of 16 in the last line of the above letter. The above letter was written after plaintiffs had filed suit but before any action on their appeal by the Board of Regents.

On November 23, 1960 Dr. Aderhold wrote defendant:

"Attached herewith is a copy of letter from Dr. Williams under date of November 23, 1960, relative to the housing situation for girls. You will note Dr. Williams recommends that 'Because of the above situation, I recommend that no additional women students be admitted to the University for the winter quarter. This recommendation applies to both students in the approved admissions policy categories and former students who are seeking readmission.'

"I concur in Dr. Williams' recommendation and suggest that the admissions officials carry out the recommendation."

The above letter was written eighteen days after plaintiff Hunter had completed her interview but prior to any notification of the results of said interview from defendant.

Several students were accepted for admission to the Fall Quarter, 1959 whose applications were received by defendant after July 22, 1959, the date plaintiffs' applications were marked received. Some of these students did not require University housing, being students living with parents or relatives or freshman

men who are veterans or married. However, others would apparently require housing. Defendant testified that these students were exceptional cases—freshman men with advanced standing, a transfer from the Rome University Center of the University of Georgia, and football players who had already received grants-in-aid from the University.

Just prior to the opening of the Fall Quarter, 1959, University housing authorities made 81 over-assignments in University housing for men and 201 over-assignments in University housing for women. Thereafter, on October 1, 1959, shortly after the beginning of Fall Quarter, 1959, there were 28 more male students actually living in University housing for men than the normal capacity of dormitories for men, and 132 more female students actually living in University housing for women than the normal capacity of dormitories for women. However, shortly after the beginning of the Winter Quarter, 1960, with admissions limited to students in categories 1 and 2, there were only 15 more male students actually living in University housing than the normal capacity of dormitories for men, and only 7 more female students actually living in University housing than the normal capacity of dormitories for women. Moreover, University records indicate that there were actually some vacancies at that time in particular dormitories—two vacancies in Milledge for men, two vacancies each in Mary Lyndon, Rutherford and Clark for women, and eleven vacancies in Lucy Cobb for women.

Shortly after the beginning of the Spring Quarter, 1960, with admissions still limited to students in categories 1 and 2, there were 63 actual vacancies in University housing for men and 41 actual vacancies for women. But plaintiffs were still denied admission to the Winter and Spring Quarters, 1960 "due to limited facilities," not being students in categories 1 and 2, that is, "transfers who need to change in order to continue their academic program" or "freshmen who have never been to college."

There were admittedly many vacancies for the Summer Quarter, 1960, but defendant contends that neither plaintiff applied for admission to that quarter. Of course, plaintiff Hunter had written defendant on December 7, 1959, that she had "enrolled in a university with a view in mind of transferring to the University of Georgia at the earliest possible time". Plaintiff Holmes had written defendant on November 17, 1959 that he was "still desirous of enrolling in the University of Georgia at the earliest possible time." Furthermore, plaintiff Holmes had written defendant requesting "a list of the courses that will be offered during the Spring quarter, and the approximate amount of money a legal resident student needs to cover fees, room and board for the Spring and Summer quarter."

Plaintiff Hunter was denied admission for the Fall Quarter, 1960 "due to limited facilities", the letter from her mother to defendant requesting consideration specifically for the Fall Quarter, 1960 having been written on June 2, 1960 and Dr. Aderhold's letter requesting defendant to accept no more students for the Fall Quarter, 1960 "except those who may need to transfer from junior colleges of the University System" having been written on May 18, 1960. However, some female students requiring University housing were accepted after that "cut-off date" of May 18, 1960. Defendant testified that these students were also exceptional cases—two female transfer applicants who had submitted applications on or before May 18, 1960 but which applications had not been finally processed [in this connection, it should be noted that, on May 18, neither of these applicants had completed the personal interview requirement], a female transfer student who was a war orphan not allowed "to make another change in institutions and still continue her support from the Government", and a female transfer applicant accepted because of "an error on the part of the Dean of Women's office".

Shortly after the beginning of the Fall Quarter, 1960, on October 5, 1960,

there were 72 more male students actually living in University housing than the normal capacity of dormitories for men, and 175 more female students actually living in University housing than the normal capacity of dormitories for women.

Admissions for the Winter Quarter, 1961 have been limited to students in categories 1 and 2. Although, at the time of trial, all housing accommodations known to be available had been filled for the Winter Quarter, 1961, there were comparatively few over-assignments, and the housing officials were understandably unable to say how many current students assigned to rooms would not return, or how many new students assigned to rooms would not actually register, thereby leaving vacancies available for housing women students.

Undoubtedly, housing facilities at the University of Georgia have been taxed, particularly in the Fall Quarters of 1959 and 1960. However, the reason behind the "limited facilities" preventing plaintiffs' admission is probably best expressed in a handwritten letter, dated June 15, 1960, from Dr. Harmon Caldwell, Chancellor of the University System, to President Aderhold, with reference to a request from Howard Callaway, a member of the Board of Regents, for assistance in getting a white applicant admitted: "I have written Howard that it is my understanding that all of the dormitories for women are filled for the coming year. I have also indicated that you are relying on this to bar the admission of a Negro girl from Atlanta."

Such a purpose is also evidenced by a letter from Breedlove Arrington, a transfer student denied admission to the University, to defendant, in which he writes:

"Upon receiving your letter, stating that I could not be accepted to the University, I made a trip to Athens and talked to one of the counselors [sic] about what prevented me from being accepted and what I could do to be accepted. He said that there were several reasons why I could not be accepted. One of them was because of my poor record at Tech and the other was that they did not have a quota for students from senior colleges due to segregational problems. If the reason was because of my grades at Tech I would like to present my case in the following manner: If I stay at Tech for another quarter and take a normal load and maintain a C average could I be accepted to the University in the fall quarter of 1960? If there is any reason why I can not be accepted, due to segregational problems, I would appreciate any advice you might give me which would enable me to penetrate this barrier."

## C. Interviews.

Defendant testified at the hearing on plaintiffs' motion for preliminary injunction that he was unable to consider plaintiff Holmes' application for the Fall Quarter, 1960 because Holmes had not had the required personal interview. And on November 29, 1960 defendant rejected Holmes for admission to the University "from a review of [his] records and on the basis of [his] personal interview." Therefore, some discussion of the University's personal interview requirement is particularly important.

The evidence discloses the following pertinent facts. Since the Winter Quarter, 1960 defendant has generally required a satisfactory personal interview of applicants for admission to the University, pursuant to action of the Board of Regents taken on February 11, 1959. This interview requirement has been satisfied in a number of different ways. Many freshman students have been interviewed by University representatives at College Day programs held in many white high schools throughout the State. A number of transfer students have been interviewed by University representatives at the colleges from which they are transferring. Other students have been interviewed by defendant or a member of his staff in the Registrar's office at the University. Many out-of-state ap-

plicants have been interviewed by University alumni living at or near the place of the applicant's residence. Although, in most cases, an interview record was completed on the applicant, in at least one case, a letter from an alumnus stating that the applicant was "an excellent student" and "one of the outstanding young ladies in her class" and that she "would be a definite asset to the University" was accepted in lieu of the regular interview. Although most students were interviewed before acceptance, several applicants have been accepted pending "personal interview upon arrival". Defendant testified that such conditional acceptances were only given in exceptional cases—some graduate students, applicants in the armed services, and a few out-of-state students. [Defendant failed to explain why Thomas Hadley Baker of an Atlanta address transferring from Purdue University was accepted "[p]ending satisfactory interview * * * on date of arrival".] Some students were accepted for the Winter Quarter, 1960 or subsequently whose files contain no record of interview. The affidavit of Paul Kea discloses that some of these were foreign students of whom no interview is required, some were former students, and some were students accepted pending satisfactory interview who never registered. His explanation for the absence of evidence of interview in the files of Joel Cannon and Barbara Christian is that the interview records were "apparently lost". At least one applicant was interviewed by his brother-in-law. In at least two instances, applicants were interviewed by two different interviewers who arrived at different conclusions.

Contrasted to this somewhat loose application of the interview requirement described above is the application of that requirement to plaintiffs. Little need be said about plaintiff Hunter's interview since defendant admits in his brief that, on the basis of her interview, she has given "evidence of general fitness for admission to the institution". However, these circumstances of that interview should be noted. Plaintiff Hunter was interviewed by *three* University officials —defendant and two of his staff members, Paul Kea and Dr. Morris Phelps— for approximately forty-five minutes because, according to Dr. Phelps' testimony, it was a "difficult case" since the University had never before received a student from Turner High School, a Negro high school in Atlanta. Plaintiff Hunter was asked numerous questions, including whether she "had any apprehension concerning being the first Negro to enter the University of Georgia".

Plaintiff Holmes was interviewed by the same three University officials for approximately one hour because, in Dr. Phelps' words, his, too, "was a particularly difficult case" having "already been presented at court". The atmosphere of the interview of Holmes was entirely different from that of the interview of Miss Hunter, however. Apparently the interview was conducted with the purpose in mind of finding a basis for rejecting Holmes. He was asked, in substance, the following questions which were not asked of Miss Hunter and which had probably never been asked of any applicant before:

1) Have you ever been arrested?

2) Have you ever attended inter-racial parties?

3) What is your opinion concerning the integration crises in New Orleans and in Atlanta?

4) Give some insight into the workings of the student sit-in movement in Atlanta.

5) What are some of the activities of the student sit-in movement, and have you ever participated therein?

6) Do you know of the tea houses (or coffee houses or Beatnik places) in Atlanta, and have you ever attended any of them?

7) Do you know about the red light district in Athens?

8) Have you ever attended houses of prostitution?

9) Since you are interested in a premedical course, why have you not applied

to Emory University, since it is in Atlanta?

Holmes' interview record discloses that he was marked "average" on physical appearance, poise, maturity, seriousness of purpose, and social adaptability, and "poor" on verbal expression and cooperativeness. These comments are made: "Student was evasive with his answers. Some doubt as to his truthfulness." Dr. Phelps, who was the chief interviewer, testified at the trial that the doubt as to Holmes' truthfulness was because Holmes said he had never been arrested, whereas defendant Danner had "heard" somewhere that he had been. Holmes testified that he had been fined for a traffic violation, speeding, but did not believe that that infraction constituted an arrest. [In this connection see 6 C.J.S. Arrest § 1, p. 571, n. 11]. Danner testified that Holmes was evasive in that he "didn't give any good reasons why he did or did not pick out Emory in preference to the University and why he picked out the University" and in that "he gave two different statements in reference to [why he did not come for an interview sometime in June]."

Three other points should be noted: 1) Dr. Aderhold testified that, on appeal to him by Horace Ward from Ward's denial of admission to the University Law School, he concurred in a faculty committee's finding that Ward was evasive, inconsistent and contradictory, almost the same thing said about Holmes in this case.

2) Defendant testified that he cancelled a personal interview with Holmes scheduled for about July 20, 1960 because Holmes "had appealed it to the President and the Chancellor" and "it was out of [his] hands". However, defendant had sent Holmes a check list, on June 28, 1960, showing he lacked a personal interview knowing at that time that Holmes had appealed. [In this connection see Dr. Aderhold's letter of June 8, 1960 to plaintiffs' attorney, Donald L. Hollowell.]

3) In one instance an applicant described as a "Big, Burly Character" was accepted whose interview sheet showed, with respect to the interviewer's reactions, two "poor" check marks and five "average" check marks. This applicant was interviewed by Dr. Phelps who also filled out the interview sheet for plaintiff Holmes, marking him "average" on five reactions and "poor" on two.

It is evident from the above that the interview of Holmes was not conducted as the interview of white applicants and, from the evidence as a whole and particularly from Holmes' appearance as a witness at the trial, it is also evident that, had the interview of Holmes been conducted and evaluated in the same manner as the interviews of white applicants, Holmes would have been found "to be an acceptable candidate for admission to the University".

### D. Miscellaneous.

A few other facts impelling the court's conclusions should be mentioned. One is that, as early as December 15, 1959, long before any appeal had been filed by plaintiffs, defendant was sending blind copies of letters written by him to plaintiffs, to Mr. John Ferguson, an attorney in the Attorney General's office.

It should also be noted that defendant was handling plaintiffs' applications against the same background of Georgia law discussed above in regard to the adequacy of the administrative remedy.

While defendant and his subordinates were generally helpful to students desiring information or making application for admission, defendant often left the questions asked in plaintiffs' letters unanswered in his replies. [In this connection see the correspondence between plaintiffs and defendant set out in the court's memorandum opinion filed September 25, 1960.]

Some white applicants were sent check sheets advising them to have interview "within two weeks" or within one week "as spaces are filling up rapidly". Other white applicants who could not be admitted at a particular quarter were advised to attend an off-campus center or another college in the University System for a

quarter and then transfer to the University. On the other hand, plaintiffs never received any helpful advice from defendant or other staff members in his office.

A comparison of the efforts of plaintiff Hunter to enter the University with the efforts of Miss Bebe Dobbs Brumby would seem to be in order. In the summer of 1960 both Miss Hunter and Miss Brumby had completed one-year's work at out-of-state liberal arts colleges. Both are interested in studying journalism, and the colleges at which both completed their first year's work offer major studies in journalism. Both were denied admission to the Fall Quarter, 1960 because of "limited facilities". However, Miss Brumby was advised to attend the Marietta University Center of the University of Georgia for the Fall Quarter, 1960 and has now been accepted for admission to the University at the Winter Quarter, 1961. Miss Hunter was given no advice, and has been denied admission because of "limited facilities".

Defendant contends that Miss Brumby is now in the category of "transfers who need to change in order to continue their academic program" although the evidence reveals that a student may transfer the equivalent of three-quarters' credits from an off-campus center of the University and that the equivalent of six-quarters' credits in liberal arts is required for the degree of bachelor of arts in journalism. Defendant contends that Miss Hunter is not in the category of "transfers who need to change in order to continue their academic program" since she is presently in a semester which will not be completed prior to the beginning of the Winter Quarter, 1961.

### Damages.

■ For the reasons that plaintiffs have failed to prove, by a preponderance of the evidence, any damages *proximately flowing* from defendant's wrongful acts, and have failed to prove that they have minimized any damages which might have occurred, and have further failed to prove that they, and not someone else, are entitled to recover any damages which might have resulted from defendant's wrongful acts, no damages will be allowed either plaintiff.

### Class Action.

■ This is a class action, the class being formed by the presence of the common question of law or fact. The rights of each member of the class are distinct. It is as individuals that plaintiffs are entitled to equal protection of the laws.

The class here is composed of Negroes who are qualified to meet all valid requirements for admission to the University of Georgia and who are therefore eligible for admission to that institution. Plaintiffs must be and are members of the class that they purportedly represent.

See Fed.R.Civ.P. 23; Hunt v. Arnold, D.C.N.D.Ga.1959, 172 F.Supp. 847; Board of Supervisors, Etc. v. Tureaud, 5 Cir., 1955, 225 F.2d 434, affirmed en banc 5 Cir., 1956, 228 F.2d 895.

### Plaintiffs' Qualifications.

Although defendant rejected plaintiff Holmes "from a review of [his] records and on the basis of [his] personal interview," Paul Kea, defendant's assistant who has the chief responsibility for evaluating transcripts of transfer students, testified that Holmes' transcript from Turner High School was a "good transcript" [36 A's and 6 B's] and that the records of his first two semesters' work at Morehouse College were "satisfactory" transcripts [one C, 2 P's, 5 B's, and 7 A's].

Although the contention was made at the trial that Holmes' application lacked a certificate of honorable dismissal from Morehouse College, at the hearing on the motion for preliminary injunction, defendant testified that he did not "know of anything that would disqualify [Holmes] if he had [the personal] interview, and if that interview were entirely favorable." It should also be noted that the file of at least one other transfer student who was admitted contains no certificate of honorable dismissal. Furthermore, there is not the slightest intimation in the evidence that plaintiff

Holmes is not eligible for honorable dismissal from Morehouse College.

Defendant also testified at the trial that plaintiff Hunter could be admitted to the University for the Spring Quarter, 1961, even under the categories, if she remained out of school from the close of her Fall Semester to the beginning of Spring Quarter, 1961. Therefore, there seems to be no contention by defendant that plaintiff Hunter's academic record is not presently a satisfactory one.

Defendant also testified:

"If we did not have categories and a student desired to transfer [from a semester system school to the University of Georgia, which operates on the quarter system] they would have to drop all they had and that institution would have to say 'they're passing all of their work'; and we would allow them to transfer with no credits for that fall quarter."

Therefore, since plaintiffs would have already been admitted to the University except for their race and color, plaintiffs are qualified for and entitled to immediate enrollment at the University of Georgia for the Winter Quarter, 1961.

### Decree.

Pursuant to the foregoing findings of fact and conclusions of law, it is

Ordered, Adjudged and Decreed that the defendant, Walter N. Danner, his agents, employees, successors, associates and all persons in active concert and participation with him are hereby permanently enjoined as follows:

From refusing to consider the applications of the plaintiffs and other Negro residents of Georgia for admission to the University of Georgia upon the same terms and conditions applicable to white applicants seeking admission to said University; and from failing and refusing to act expeditiously upon applications received from Negro residents of Georgia; and from refusing to approve the applications of qualified Negro residents of Georgia for admission to said University solely because of the race and color of the Negro applicants; and from subjecting Negro applicants to requirements, prerequisites, interviews, delays and tests not required of white applicants for admission; and from making the attendance of Negroes at said University subject to terms and conditions not applicable to white persons; and from failing and refusing to advise Negro applicants promptly and fully regarding their applications, admission requirements and status as is done by the defendant and his associates in the case of white applicants; and from continuing to pursue the policy, practice, custom and usage of limiting admissions to said University to white persons.

The court recognizes that the primary right and duty of fixing admission requirements and passing upon the qualifications of applicants for admission to the University of Georgia rests upon those in authority at that institution, and nothing in this order, judgment and decree shall be construed to restrict the proper exercise of that right and duty. The intent of the injunction herein granted is only to restrict the exercise of that right and duty so as to forbid admission requirements which will deny to Negroes equal protection or due process of law and to forbid denial of admission to Negroes, who are qualified for such admission, solely on the ground of their race or color.

Inasmuch, however, as it has been made to appear, and is found by the court, that the two plaintiffs are fully qualified for immediate admission to said University and would already have been admitted had it not been for their race and color, it is a further intent of this injunction that the defendant and other persons above indicated be and they are hereby enjoined from refusing to permit the plaintiffs to enroll in and enter said University as students therein immediately for the now beginning Winter Quarter, 1961, or at the appropriate time for the approaching Spring, Summer or Fall Quarter, 1961, as each plaintiff may elect, provided only that, if either plaintiff is, at the time he or she elects to

enroll in and enter said University, then pursuing in any other institution a course or courses of study then not completed, such student shall furnish to defendant a letter or statement from such other institution that such student is then doing passing work in such uncompleted course or courses, and in any event such student shall furnish evidence of having satisfactorily passed all completed work taken by such student at such institution, and shall also furnish evidence that he or she is eligible for honorable dismissal from such institution, and provided also each plaintiff shall act with reasonable promptness in presenting himself or herself for enrollment in the University of Georgia, doing so on or before January 9, 1961, if practicable, in the event present Winter Quarter enrollment is desired, and notifying the defendant with reasonable promptness in the event a later enrollment is desired. The plaintiffs are entitled to this leeway as to choice of enrollment date because of the fact that they are now attending semester basis institutions and might have to give up claim for credits for the work done during the Fall of 1960, their present semesters not having been completed. It is further the intention and purpose of this decree that the defendant and all other persons above indicated shall do whatever is necessary to be done to permit the plaintiffs to enroll in and enter said University as students therein in accordance with this decree.

The plaintiffs' claims for damages are denied, and plaintiffs are permitted no money recovery against the defendant. It is ordered, however, that the defendant pay the costs herein.

This court retains jurisdiction of this cause for the purpose of making any and all additional findings and conclusions and of entering any and all additional orders as may become necessary or appropriate for the enforcement, modification or implementation of this decree, or for any other lawful purpose.

**Granting Stay of Court's Order.**

As the Court sees it, the particular problem this morning is not difficult; it is not complicated. This Court entered its decree upon findings of fact stating the rights of the parties to this case as this Court understands, sees and construes those rights, and of course the decree was specific, as all decrees ought to be in order that interested parties may know what they mean.

At the same time, every litigant has the right of an appeal, and this Court is entirely hospitable to the exercise of that right with respect to any and all of its rulings, and unless there are compelling reasons to the contrary it is desirable that an appeal may be had before the judgment appealed from is executed or performed or carried out. The specificity of the decree does not cut off the right of appeal. It specifies the rights of the parties if there is no appeal, or after the affirmance of the decree if there is an appeal and if the decree should be affirmed. Nor does the fact that the decree is specific and detailed prejudge any future motion that may be made for a stay or suspension of the decree pending the outcome of the appeal.

The trial court is properly vested with a sound and broad discretion in allowing or in not allowing a stay or suspension of the judgment appealed from. Of course something can be said for and against a stay in this case, but, all things considered, I think it perfectly proper to grant the stay, provided it is granted upon certain terms and conditions.

Let me say at this point that this Court is not allowing this stay because of the terms of the Appropriations Act or because of any confusion or uncertainty that might result from the terms of that Act. I am allowing this stay solely in order that the defendant in this case might exercise his legal right of appeal in order to test the correctness or incorrectness of the decree heretofore entered by this Court, and in order that he might do so before the decree has to be carried out.

412

Now the conditions which I referred to should be imposed because, in a case of this kind, time is somewhat of the essence and because of the fact that the University of Georgia should not be deprived of its records and access to them any longer than is necessary.

The appeal in this case having already been filed, and timely filed, and appellant's counsel having already filed a designation of the record upon appeal so that no additional time will be required for filing a designation of points, and counsel for the appellant having stated in open court that they have as their purpose the diligent prosecution of this appeal,

 Now, Therefore, the stay and suspension of the decree pending the outcome of the appeal to the Court of Appeals for the Fifth Circuit is hereby granted upon and subject to the following terms and conditions:

1. The defendant shall, through his counsel, cooperate fully with plaintiffs' counsel to the end that this appeal may be heard and determined at the earliest practicable date by the Court of Appeals, and, if possible and practicable, before the beginning of the spring quarter at the University of Georgia.

2. The defendant shall, through his counsel, do whatever is necessary to be done to enable the Clerk of this court to prepare and transmit the record to the Court of Appeals as promptly as possible and without delay.

3. The defendant shall, through his counsel, join plaintiffs' counsel, if plaintiffs' counsel so desire, in respectfully requesting the Court of Appeals, if it deems it practicable and wise: (a) to set this case for an early hearing at New Orleans rather than awaiting any regular session in Atlanta; (b) to hear this case upon the presently available typewritten transcripts of the evidence and upon typewritten briefs so as to avoid delays incident to printing.

4. The defendant shall execute bond in the amount of $5,000, with security to be approved by the Clerk, conditioned to pay to plaintiffs or their parent or parents the excess of cost, including travel, of each plaintiff continuing to attend his or her present school, over what such cost, including travel, would be to attend the University of Georgia from now until such plaintiff is permitted to enter the University of Georgia, in the event the provisions of the decree heretofore rendered for immediate entrance are affirmed on appeal.

So ordered.

### Temporary Restraining Order Granted Without Notice.

This cause came on to be heard on the motion of plaintiffs for a temporary restraining order and affidavit of Donald L. Hollowell, and it appearing to the court therefrom that there is danger of immediate and irreparable injury, loss and damage being caused to the plaintiffs before notice can be served and a hearing had on plaintiffs' motion for a preliminary injunction, for the reason that such injuries are liable to occur before a hearing upon notice can be had inasmuch as, on January 9, 1961, at midnight, the Governor of the State of Georgia, the Honorable S. Ernest Vandiver, issued a public statement that he is required by the laws of Georgia [Appropriations Act of 1956, Sections 8(a) and 8(d)] to cut off all funds appropriated to the University of Georgia since this Court, on January 6, 1961, entered an order directing the admission of plaintiffs, who are Negroes, to the University of Georgia, and because it appears from other public statements that the Governor has ordered the University of Georgia closed for at least one week beginning at noon, January 10, 1961, for the reason that the said Appropriations Act requires him to cut off the funds appropriated to the University, and because it appears that if the funds appropriated to the University are cut off pursuant to said Act, the University is effectively closed, and because it appears that, if the funds are cut off and the University closed, plaintiffs will continue to suffer the irreparable injury to their constitutional rights which this

Court found, on January 6, 1961, has resulted to plaintiffs because of the actions of the defendant herein, and because it appears that every day of schooling lost by these plaintiffs and the 7,500 other students presently enrolled in the University is an irreparable injury and loss, and because it appears that this injury will result before notice of plaintiffs' motion for preliminary injunction can be given to the Governor in the special circumstances of this case, it is

Ordered, that S. Ernest Vandiver, as ex-officio Director of the Bureau of the Budget of the State of Georgia, and B. E. Thrasher, Jr., Assistant Director of the Bureau of the Budget, their agents, servants, employees, attorneys, successors, and all persons in active concert and participation with them are hereby restrained from cutting off or refusing to furnish any and all funds heretofore or hereafter to be appropriated or apportioned to the University of Georgia at Athens under or in accordance with the General Appropriations Act of 1956, if said act be read as not containing any provisions for cut off of funds, on condition that a bond be filed by plaintiffs herein in the sum of $5,000 for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained, said bond to be approved by the Clerk of this court; and it is further

Ordered that plaintiffs' motion for a preliminary injunction be set for hearing on January 12, 1961 at 10:30 a. m., in the forenoon of that day or as soon thereafter as counsel can be heard, in the United States District Court, Middle District of Georgia, at Macon, Georgia, and that S. Ernest Vandiver and B. E. Thrasher then and there show cause why they should not be made parties to this case and enjoined as prayed.

Ordered, that this order expire at the expiration of ten days from the entry hereof unless prior thereto this order is extended properly.

Temporary Injunction.

On January 6, 1961 this Court entered a decree in the above-styled action permanently enjoining defendant, Registrar of the University of Georgia, "his agents, employees, successors, associates and all persons in active concert and participation with him" in substance from discriminating against plaintiffs and "other Negro residents of Georgia" in the matter of admission to the University of Georgia as students.

On January 10, 1961 plaintiffs filed a "motion for further relief" in which they asked this Court to grant a temporary restraining order, without notice, restraining the Honorable S. Ernest Vandiver, Governor of the State of Georgia and Director of the Budget, and the Honorable B. E. Thrasher, Jr., Auditor of the State of Georgia and Assistant Director of the Budget, "their agents, successors, associates and all persons in active concert and participation with them from enforcing Sections 8(a) and 8(d) of the 1956 Appropriations Act (Ga.Laws 1956, Vol. I, pp. 753, 762–65)". Because it appeared to this Court that "danger of immediate and irreparable injury, loss and damage being caused to plaintiffs [and the 7,500 other students enrolled in the University] before notice [could] be served and a hearing had on plaintiffs' motion for a preliminary injunction" existed, plaintiffs' motion for a temporary restraining order was granted.

That restraining order also set a hearing for January 12, 1961 at 10:30 a. m. on plaintiffs' motion for a preliminary injunction. That hearing has been held and, upon the basis of the evidence adduced thereat and the stipulations between the parties there made, the Court is of the opinion that plaintiffs' motion for preliminary injunction should be granted. The following is intended to comply with the requirements of Fed.R. Civ.P. 52(a) with respect to findings of fact and conclusions of law.

## Findings of Fact.

### 1.

The Honorable S. Ernest Vandiver is Governor of the State of Georgia and, as such, ex-officio Director of the Budget. The Honorable B. E. Thrasher, Jr., is Auditor of the State of Georgia and, as such, ex-officio Assistant Director of the Budget. Ga.Code Ann. § 40–401.

### 2.

In a letter dated January 9, 1961, said Director of the Budget wrote the Honorable Garland Byrd, Lieutenant Governor, and the Honorable George L. Smith, II, Speaker, House of Representatives, as follows:

"After the ruling this afternoon by Chief Judge Elbert P. Tuttle of the Fifth Circuit of the United States Court of Appeals, I dispatched Honorable Eugene Cook, The Attorney General and his associate Special Counsel, representing the State of Georgia in the University case, to Washington, D. C., to seek from the appropriate Justice of the United States Supreme Court a supersedas [sic] in order that the State may appeal the cause on its merits. A determination should be forthcoming on this by mid-day Tuesday. At that time every present legal resource will have been exhausted.

"Meanwhile, it has been announced that the plaintiffs will be in attendance at classes at the University of Georgia Tuesday morning under an order of Middle District Judge William A. Bootle.

"Section VIII(d) of the Appropriations' Act of 1956 places the mandatory responsibility upon me to make an administrative determination of such entry, and as Director of the Bureau of the Budget of the State of Georgia to then and there recognize such fact and to enter up an order carrying out the provision of the above cited Act, which, under such circumstances, provides, in part, as follows:

"' * * * in such event no further funds shall be expended from such apportionment and the unexpended portion thereof shall be retained in the Treasury * * *'

"It is the saddest duty of my life to sign an order recognizing that such a condition as contemplated by the statute does in fact now exist and that the State fund support must be withheld from the University.

"That I must do when the event takes place. I am sure that you and members of the General Assembly understand that no other alternative was available to me. After a 10-year legal battle conducted by the Attorney-General and the same special counsel, who have fought effectively and with dignity, all legal resources available and in this instance have been exhausted.

"Without State appropriated funds and denied the expenditure of appropriated fees, the University of Georgia cannot operate as long as the funds prohibition is contained in the 1956 Act.

"Its very existence in the law is a roadblock to the application of admission requirements to prospective students and, if allowed to stand, strips us of remaining safeguards and would cause chaos and confusion without any effective results whatsoever.

"Developments since 1956 have turned sub-section 8(d) from a source of hope to an albatross; indeed, events have given it the diametrically opposite effect from which it was intended by the Legislature.

"If allowed to remain in the law, its effect will be to close the doors of Georgia's hallowed halls, to cease bringing learning and enlightenment to over 7,500 young men and women pursuing a higher education, jeopardize their credits, create unrest among one of the most outstanding faculties in America and otherwise create harmful results

without accomplishing anything. Such wanton disregard of the learning process, I am sure you would agree with me, would be unthinkable. Besides, I have great faith. in Georgia's youth of college age to take care of themselves, act as ladies and gentlemen and to reflect the highest credit on their State.

"I will not be a party to defiance of law, as a few would wish, or do anything which might foment strife and violence in an explosive situation. Therefore, in view of the above and all of the circumstances I urge that an amendment eliminating Section 8(d) of the Appropriations' Act of 1956 be adopted as soon as it is possible to do so."

3.

Under the provisions of subsections (a) through (e) of Sec. 8(a) of the General Appropriations Act of 1956, were such provisions constitutional, it would be the duty of said Director of the Budget to withhold all funds from some divisions of the University of Georgia as soon as this Court's order requiring the admission of plaintiffs to the University is complied with.

4.

It is the express intention of said Director of the Budget to comply with such duty unless this Court restrains him from so doing.

5.

If said intention is carried out and funds are withheld from some divisions of the University, immediate and irreparable injury, loss and damage will result to plaintiffs and many of the 7,500 other students enrolled at the University.

6.

If funds are withheld from some divisions of the University, said divisions of the University will be closed for an indefinite period, resulting in loss of schooling not only by plaintiffs but by many of the 7,500 other students enrolled at the University, notwithstanding the fact that, in said quoted letter, said Director of the Budget with commendable forthrightness urged a legislative amendment eliminating subsection (d) of section 8 (a) of the General Appropriations Act of 1956 "as soon as it is possible to do so".

7.

The Honorable George B. Hamilton, Treasurer of the State of Georgia, who says he has the "responsibility of payments out of the Treasury," has indicated by letter to the Honorable B. E. Thrasher, Jr., dated January 11, 1961, that he feels it is his "responsibility to retain unexpended portion of the apportionment" to the two schools of the University to which plaintiffs have been admitted "in the treasury" because of the provisions of subsection (d) of Section 8(a) of the General Appropriations Act of 1956, supra, and that he is presently "holding warrants numbers 1003 and 1005 payable to James A. Blissit, Treasurer of the University System." The Honorable Eugene Cook, Attorney General of the State of Georgia, has advised the Court, however, that, in view of the findings of fact, conclusions of law and decree herein being entered, Mr. Hamilton will have no hesitancy in releasing funds to the University of Georgia.

Conclusions of Law.

1.

■ This Court has jurisdiction to grant a preliminary injunction enjoining the enforcement of Subsections (a) through (e) of Section 8(a) of the General Appropriations Act of 1956, supra, without convening a special three-judge court, because no substantial question regarding the constitutionality of said provisions is present. Ex parte Poresky, 1933, 290 U.S. 30, 54 S.Ct. 3, 78 L.Ed. 152; Bush v. Orleans Parish School Board, D.C.E.D.La.1956, 138 F.Supp. 336, mandamus denied 1956, 351 U.S. 948, 76 S.Ct. 854, 100 L.Ed. 1472; Board of Supervisors of La. St. U. & A. & M. Col. v. Ludley, 5 Cir., 1958, 252 F.2d 372, 376; Hoxsey Cancer Clinic v. Folsom, D.C.D.C. 1957, 155 F.Supp. 376.

**2.**

■ Subsections (a), (b), (c), (d) and (e) of Section 8(a) of the General Appropriations Act of 1956, supra, are clearly unconstitutional on their face. The United States Supreme Court has recently held that similar provisions fail to meet the tests of constitutionality required by the United States Constitution as construed by the decisions of that Court. Aaron v. McKinley, D.C.E.D.Ark. 1959, three-judge court, 173 F.Supp. 944, affirmed 1959, 361 U.S. 197, 80 S.Ct. 291, 4 L.Ed.2d 237. See also Cooper v. Aaron, 1958, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5; James v. Duckworth, D.C.E.D.Va.1959, 170 F.Supp. 342, affirmed 4 Cir., 1959, 267 F.2d 224; Bush v. Orleans Parish School Board [and Williams v. Davis], D.C.E.D.La.1960, three-judge court, 187 F.Supp. 42, stay denied 1960, 364 U.S. 803, 81 S.Ct. 28, 5 L.Ed.2d 36.

**3.**

The Honorable S. Ernest Vandiver and the Honorable B. E. Thrasher, Jr., should be, and they are hereby made parties to this action.

**4.**

Plaintiffs' motion for preliminary injunction should be and is hereby granted.

Let decree be entered in accordance herewith.

So Ordered.

**Preliminary Injunction.**

■ This cause came on for hearing on plaintiffs' motion for preliminary injunction enjoining the Governor of the State of Georgia, as ex-officio Director of the Bureau of the Budget of the State of Georgia, and the Assistant Director of the said Bureau from enforcing or giving effect to Sections 8(a) and 8(d) of the Appropriations Act of 1956. The hearing was held pursuant to an order issued by this court, on January 10, 1961, directing the said Governor and Assistant Director to show cause on this date why they should not be added as parties to this cause and enjoined as prayed, a temporary restraining order without notice enjoining the Governor and the Assist-

ant Director as prayed having also been issued on the same date. Counsel for both parties and counsel for the Governor and Assistant Director appeared. The Governor and the Assistant Director moved to dismiss plaintiffs' motion for further relief requesting the preliminary injunction. The court heard argument on said motion to dismiss and overruled the same. Now, after hearing counsel for all parties and after considering a written memorandum filed by the plaintiffs and a written argument filed by counsel for the Governor and the Assistant Director, and the Court having made findings of fact and conclusions of law, it is now,

Ordered, that S. Ernest Vandiver, Governor of the State of Georgia and ex-officio Director of the Bureau of the Budget of the State of Georgia, and B. E. Thrasher, Assistant Director of the Bureau of the Budget of the State, their agents, employees, successors, associates, attorneys, and all other state officials and persons in active concert and participation with them, directly and indirectly, be, and they hereby are, enjoined from cutting off or refusing to furnish or refusing to make available any and all funds appropriated or apportioned or to be appropriated or apportioned to the University of Georgia at Athens, Georgia, under or in accordance with the General Appropriations Act of 1956, or any other appropriations act, because or on account of the admission to the University of Georgia of any Negro.

Ordered Further, that S. Ernest Vandiver, Governor of the State of Georgia and ex-officio Director of the Bureau of the Budget of the State of Georgia, and B. E. Thrasher, Assistant Director of the Bureau of the Budget of the State of Georgia, be, and they hereby are, added as parties defendant in this cause.

**Temporary Injunction.**

On January 6, 1961 this court ordered the admission of plaintiffs to the University of Georgia, and plaintiffs were so admitted and enrolled as students at that institution on January 11, 1961. There-

after, during the night of January 11, 1961 a demonstration which at times became violent occurred in front of the dormitory in which plaintiff Hunter resided. Although at times the demonstration appeared to be getting out of hand, local law enforcement officers, with the help of University officials, had quelled the demonstration by 12 midnight. However, pursuant to orders from Dean of Students Joseph Williams, which orders were concurred in by University President O. C. Aderhold, shortly after the suppression of the demonstration plaintiffs were suspended from the University "in order to protect all students", and were removed from the University to their homes in Atlanta.

Counsel for respondents advise the court that they have been "informed by the Mayor of Athens and the Sheriff of Clarke County that, under normal protest demonstration, they have adequate police forces to maintain order on the campus." Counsel for respondents also advise the court that they have been informed by the Governor that, "if and when he [the Governor] is notified by the appropriate local authorities that their efforts to maintain order under protest demonstrations have failed, he will immediately dispatch adequate State police forces as provided for under the Constitution and laws of Georgia for the purpose of protecting lives and the property at the University of Georgia as the chief conservator of the peace."

However, respondents have stated that, "under the circumstances, they are not prepared at this time to voluntarily vacate the order suspending" plaintiffs.

"The constitutional rights of [plaintiffs] are not to be sacrificed or yielded to * * * violence and disorder * * *." Cooper v. Aaron, 1958, 358 U.S. 1, 16, 78 S.Ct. 1401, 1409, 3 L.Ed.2d 5. Nor can the lawful orders of

this court be frustrated by violence and disorder.

"The Court does not find and does not conclude that law and order in this State have broken down or that the law enforcement agencies of this State are unwilling or inadequate to maintain law and order at the University." Lucy v. Adams, Race Relations Law Reporter, Vol. I, No. 2, p. 323 (N.D.Ala.1956). The court is therefore of the opinion that the order of suspension or withdrawal of plaintiffs should be lifted and vacated by 8:00 a. m., January 16, 1961.

It is therefore Ordered, Adjudged and Decreed

1. That respondents, Dr. Joseph Williams, Dean of Students of the University of Georgia, and Dr. O. C. Aderhold, President of the University of Georgia, be and they are hereby made parties to this action.

2. That the order of suspension or withdrawal heretofore adopted by respondents be and the same is hereby directed to be terminated by 8:00 a. m. on January 16, 1961.

3. That Dr. O. C. Aderhold, President of the University of Georgia, Dr. Joseph Williams, Dean of Students of the University of Georgia, and all other officials of the University System of Georgia, their agents, employees, successors, associates, attorneys, and all other persons in active concert and participation with them, and all other officials of the State of Georgia having any jurisdiction, management or control over the University of Georgia are hereby temporarily enjoined from suspending, withdrawing, dismissing or otherwise causing the plaintiffs to leave the University of Georgia on the ground that the same is necessary for their personal safety because of mob action or violence on the campus of the University of Georgia or in the City of Athens, Georgia, or for any other reason related to mob action or violence.