## SWEATT *v.* PAINTER ET AL.

No. 44.   Argued April 4, 1950.—Decided June 5, 1950.

630

*W. J. Durham* and *Thurgood Marshall* argued the cause for petitioner. With them on the brief were *Robert L. Carter, William R. Ming, Jr., James M. Nabrit* and *Franklin H. Williams.*

*Price Daniel,* Attorney General of Texas, and *Joe R. Greenhill,* First Assistant Attorney General, argued the cause for respondents. With them on the brief was *E. Jacobson,* Assistant Attorney General.

Briefs of *amici curiae,* supporting petitioner, were filed by *Solicitor General Perlman* and *Philip Elman* for the United States; *Paul G. Annes* for the American Federation of Teachers; *Thomas I. Emerson, Erwin N. Griswold, Robert Hale, Harold Havighurst* and *Edward Levi* for the Committee of Law Teachers Against Segregation in Legal Education; *Phineas Indritz* for the American Veterans Committee, Inc.; and *Marcus Cohn* and *Jacob Grumet* for the American Jewish Committee et al.

An *amici curiae* brief in support of respondents was filed on behalf of the States of Arkansas, by *Ike Murray,* Attorney General; Florida, by *Richard W. Ervin,* Attorney General, and *Frank J. Heintz,* Assistant Attorney General; Georgia, by *Eugene Cook,* Attorney General, and *M. H. Blackshear, Jr.,* Assistant Attorney General; Kentucky, by *A. E. Funk,* Attorney General, and *M. B. Holifield,* Assistant Attorney General; Louisiana, by *Bolivar E. Kemp, Jr.,* Attorney General; Mississippi, by *Greek L. Rice,* Attorney General, and *George H. Ethridge,* Acting Attorney General; North Carolina, by *Harry McMullan,* Attorney General, and *Ralph Moody,* Assistant Attorney General; Oklahoma, by *Mac Q. Williamson,* Attorney General; South Carolina, by *John M. Daniel,* Attorney General; Tennessee, by *Roy H. Beeler,* Attorney General, and *William F. Barry,* Solicitor General; and Virginia, by *J. Lindsay Almond, Jr.,* Attorney General, and *Walter E. Rogers,* Assistant Attorney General.

MR. CHIEF JUSTICE VINSON delivered the opinion of the Court.

This case and *McLaurin* v. *Oklahoma State Regents, post,* p. 637, present different aspects of this general question: To what extent does the Equal Protection Clause of the Fourteenth Amendment limit the power of a state to distinguish between students of different races in professional and graduate education in a state university? Broader issues have been urged for our consideration, but we adhere to the principle of deciding constitutional questions only in the context of the particular case before the Court. We have frequently reiterated that this Court will decide constitutional questions only when necessary to the disposition of the case at hand, and that such decisions will be drawn as narrowly as possible. *Rescue Army* v. *Municipal Court,* 331 U. S. 549 (1947), and cases cited therein. Because of this traditional reluctance to extend constitutional interpretations to situations or facts which are not before the Court, much of the excellent research and detailed argument presented in these cases is unnecessary to their disposition.

In the instant case, petitioner filed an application for admission to the University of Texas Law School for the February, 1946 term. His application was rejected solely because he is a Negro.[1] Petitioner thereupon brought this suit for mandamus against the appropriate school officials, respondents here, to compel his admission. At that time, there was no law school in Texas which admitted Negroes.

The state trial court recognized that the action of the State in denying petitioner the opportunity to gain

---

[1] It appears that the University has been restricted to white students, in accordance with the State law. See Tex. Const., Art. VII, §§ 7, 14; Tex. Rev. Civ. Stat. (Vernon, 1925), Arts. 2643b (Supp. 1949), 2719, 2900.

a legal education while granting it to others deprived him of the equal protection of the laws guaranteed by the Fourteenth Amendment. The court did not grant the relief requested, however, but continued the case for six months to allow the State to supply substantially equal facilities. At the expiration of the six months, in December, 1946, the court denied the writ on the showing that the authorized university officials had adopted an order calling for the opening of a law school for Negroes the following February. While petitioner's appeal was pending, such a school was made available, but petitioner refused to register therein. The Texas Court of Civil Appeals set aside the trial court's judgment and ordered the cause "remanded generally to the trial court for further proceedings without prejudice to the rights of any party to this suit."

On remand, a hearing was held on the issue of the equality of the educational facilities at the newly established school as compared with the University of Texas Law School. Finding that the new school offered petitioner "privileges, advantages, and opportunities for the study of law substantially equivalent to those offered by the State to white students at the University of Texas," the trial court denied mandamus. The Court of Civil Appeals affirmed. 210 S. W. 2d 442 (1948). Petitioner's application for a writ of error was denied by the Texas Supreme Court. We granted certiorari, 338 U. S. 865 (1949), because of the manifest importance of the constitutional issues involved.

The University of Texas Law School, from which petitioner was excluded, was staffed by a faculty of sixteen full-time and three part-time professors, some of whom are nationally recognized authorities in their field. Its student body numbered 850. The library contained over 65,000 volumes. Among the other facilities available to the students were a law review, moot court facilities,

scholarship funds, and Order of the Coif affiliation. The school's alumni occupy the most distinguished positions in the private practice of the law and in the public life of the State. It may properly be considered one of the nation's ranking law schools.

The law school for Negroes which was to have opened in February, 1947, would have had no independent faculty or library. The teaching was to be carried on by four members of the University of Texas Law School faculty, who were to maintain their offices at the University of Texas while teaching at both institutions. Few of the 10,000 volumes ordered for the library had arrived; [2] nor was there any full-time librarian. The school lacked accreditation.

Since the trial of this case, respondents report the opening of a law school at the Texas State University for Negroes. It is apparently on the road to full accreditation. It has a faculty of five full-time professors; a student body of 23; a library of some 16,500 volumes serviced by a full-time staff; a practice court and legal aid association; and one alumnus who has become a member of the Texas Bar.

Whether the University of Texas Law School is compared with the original or the new law school for Negroes, we cannot find substantial equality in the educational opportunities offered white and Negro law students by the State. In terms of number of the faculty, variety of courses and opportunity for specialization, size of the student body, scope of the library, availability of law

---

[2] "Students of the interim School of Law of the Texas State University for Negroes [located in Austin, whereas the permanent School was to be located at Houston] shall have use of the State Law Library in the Capitol Building. . . ." Tex. Laws 1947, c. 29, § 11, Tex. Rev. Civ. Stat. (Vernon, 1949 Supp.), note to Art. 2643b. It is not clear that this privilege was anything more than was extended to all citizens of the State.

review and similar activities, the University of Texas Law School is superior. What is more important, the University of Texas Law School possesses to a far greater degree those qualities which are incapable of objective measurement but which make for greatness in a law school. Such qualities, to name but a few, include reputation of the faculty, experience of the administration, position and influence of the alumni, standing in the community, traditions and prestige. It is difficult to believe that one who had a free choice between these law schools would consider the question close.

Moreover, although the law is a highly learned profession, we are well aware that it is an intensely practical one. The law school, the proving ground for legal learning and practice, cannot be effective in isolation from the individuals and institutions with which the law interacts. Few students and no one who has practiced law would choose to study in an academic vacuum, removed from the interplay of ideas and the exchange of views with which the law is concerned. The law school to which Texas is willing to admit petitioner excludes from its student body members of the racial groups which number 85% of the population of the State and include most of the lawyers, witnesses, jurors, judges and other officials with whom petitioner will inevitably be dealing when he becomes a member of the Texas Bar. With such a substantial and significant segment of society excluded, we cannot conclude that the education offered petitioner is substantially equal to that which he would receive if admitted to the University of Texas Law School.

It may be argued that excluding petitioner from that school is no different from excluding white students from the new law school. This contention overlooks realities. It is unlikely that a member of a group so decisively in the majority, attending a school with rich traditions and

prestige which only a history of consistently maintained excellence could command, would claim that the opportunities afforded him for legal education were unequal to those held open to petitioner. That such a claim, if made, would be dishonored by the State, is no answer. "Equal protection of the laws is not achieved through indiscriminate imposition of inequalities." *Shelley* v. *Kraemer,* 334 U. S. 1, 22 (1948).

It is fundamental that these cases concern rights which are personal and present. This Court has stated unanimously that "The State must provide [legal education] for [petitioner] in conformity with the equal protection clause of the Fourteenth Amendment and provide it as soon as it does for applicants of any other group." *Sipuel* v. *Board of Regents,* 332 U. S. 631, 633 (1948). That case "did not present the issue whether a state might not satisfy the equal protection clause of the Fourteenth Amendment by establishing a separate law school for Negroes." *Fisher* v. *Hurst,* 333 U. S. 147, 150 (1948). In *Missouri ex rel. Gaines* v. *Canada,* 305 U. S. 337, 351 (1938), the Court, speaking through Chief Justice Hughes, declared that "petitioner's right was a personal one. It was as an individual that he was entitled to the equal protection of the laws, and the State was bound to furnish him within its borders facilities for legal education substantially equal to those which the State there afforded for persons of the white race, whether or not other negroes sought the same opportunity." These are the only cases in this Court which present the issue of the constitutional validity of race distinctions in state-supported graduate and professional education.

In accordance with these cases, petitioner may claim his full constitutional right: legal education equivalent to that offered by the State to students of other races. Such education is not available to him in a separate law school as offered by the State. We cannot, therefore,

agree with respondents that the doctrine of *Plessy* v. *Ferguson,* 163 U. S. 537 (1896), requires affirmance of the judgment below. Nor need we reach petitioner's contention that *Plessy* v. *Ferguson* should be reexamined in the light of contemporary knowledge respecting the purposes of the Fourteenth Amendment and the effects of racial segregation. See *supra,* p. 631.

We hold that the Equal Protection Clause of the Fourteenth Amendment requires that petitioner be admitted to the University of Texas Law School. The judgment is reversed and the cause is remanded for proceedings not inconsistent with this opinion.

*Reversed.*