James Jonathan MAPP et al., Plaintiffs-Appellants,

v.

The BOARD OF EDUCATION OF the CITY OF CHATTANOOGA, TENNESSEE, et al., Defendants-Appellees.

James Jonathan MAPP et al., Plaintiffs-Cross-Appellees,

v.

The BOARD OF EDUCATION OF the CITY OF CHATTANOOGA, TENNESSEE, et al., Defendants-Cross-Appellants.

Nos. 15038, 15039.

United States Court of Appeals
Sixth Circuit.

July 8, 1963.

---

5. Broden, Law of Social Security and Unemployment Insurance, 3 (Callaghan & Co. 1962).

572

Constance Baker Motley, New York City, and Avon N. Williams, Jr., Nashville, Tenn. (Jack Greenberg, Leroy D. Clark, New York City, Z. Alexander Looby, Nashville, Tenn., Bruce Boynton, Chattanooga, Tenn., on the brief), for James Jonathan Mapp and others.

Raymond B. Witt, Jr., Chattanooga, Tenn. (Witt, Gaither, Abernathy, Caldwell & Wilson, Chattanooga, Tenn., on the brief), for Board of Education of City of Chattanooga and others.

Before MILLER, WEICK and O'SULLIVAN, Circuit Judges.

O'SULLIVAN, Circuit Judge.

This school desegregation case involves the public schools of Chattanooga, Tennessee. The plaintiffs, a group of Negro public school children of Chattanooga, appearing by their parents, as next friends, filed their complaint on April 6, 1960, asking an injunction to compel the desegregation of that city's public schools. The Chattanooga schools were at that time admittedly segregated. In its answer, defendant school board admitted its duty to desegregate "with all deliberate speed," Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083, but answered that it had been, and was then, conducting a program of "elucidation" to prepare the community of Chattanooga for the initiation and carrying out of the desegregation commanded by the Brown decision. It insisted that further time was needed for such indoctrination and conditioning to the end that desegregation could have an orderly beginning and that, when started, could be continued without the collisions, inefficiency and possible violence that might accompany too precipitate a start or too rapid accomplishment of total desegregation.

After motions for summary judgment were made by both parties, the District Judge sustained plaintiff's motion and directed defendant Board of Education to submit a plan of desegregation. The Board's first plan was disapproved. Thereupon, defendants appealed to this Court, attacking the orders granting plaintiffs' motion for summary judgment and rejecting the Board's first plan. We sustained the District Court's orders. Mapp v. Board of Education of City of Chattanooga, 6 Cir., 295 F.2d 617 (1961). Further hearings were conducted with the Board submitting successive plans, until the judgment or decree here involved was entered in April of 1962. The plan approved by that decree will accomplish complete desegregation of Chattanooga's public schools by September 1, 1969; the elementary grades on September 1, 1964; the junior high schools by September 1, 1967; the senior high schools by September 1, 1968; and the post-high-school technical institute by September 1, 1969. All parties appear to find this broad scheme of desegregation acceptable. Plaintiffs and defendants, however, both object to, and have appealed from, specific portions of the District Court's orders and decrees, which we discuss below.

1. *Notice of Intent and Transfer Privilege.* (Appeal No. 15039)

■ a) *Notice of Intent.* The initial step of the submitted plan was to desegregate on September 1, 1962, the first three primary grades in some sixteen designated schools. The plan provided for "a new single school zone" for each of such schools. Because of the year-by-year plan, there would continue, during its progress, some schools totally or partially segregated under what had been the "dual zone" system. Item V of the defendants' plan provided in part as follows:

"V. Admission to Schools by Single Zone.

"1. Beginning with the school year 1962–63, students in grades one, two and three residing within a new single school zone which places the pupil in a different school than the one he would attend under existing zones, may enroll in his new single zone school provided:

"(a) said school has been desegregated by the Board of Education; and

"(b) provided parents, guardians, or those acting in the position of parents of students desiring to enroll in said schools, shall file a written notice of intent with the Board of Education, at its official headquarters. * * *"

As did the District Judge, we find the quoted portion of item V unclear in its expressed requirements and purposes. Construing it, however, as permitting the continuance of some segregation in the first three grades initially to be desegregated, the District Judge said, "The Court does expressly disapprove of so·

much of the defendants' proposed admission plan as would require any student or parent to apply for or consent to implementation of desegregation in accordance with the Plan." We are in accord. Inasmuch as the requirement of "notice of intent" was apparently intended to apply only to the initial step to be taken on September 1, 1962, and we assume that, in obedience to the District Court's decree, such step was accomplished without requiring a "notice of intent," the matter is now moot. No further discussion is warranted.

■ b) *Transfer Privilege.* Item VI of the Board's plan provided that during the progress of integration, students in desegregated schools could be given the privilege of transferring out of a desegregated school if the majority of the students in such school, or in a class thereof, were of a different race than the student seeking such transfer. The pertinent part of such Item VI is as follows:

"VI. Privilege of Transfer.

"1. Upon receipt of applications, as provided in existing school board policy, transfer of students in desegregated schools may be granted when good cause therefor is shown.

"2. The following will be regarded as some of the valid reasons of good cause for transfer.

"(a) When a student would otherwise be required to attend a school where the majority of students in that school or in his class were of a different race."

The District Judge disapproved this transfer provision notwithstanding that we had, in Kelley v. Board of Education of Nashville, 270 F.2d 209, 215, 228 (C.A.6, 1959) cert. denied, 361 U.S. 924, 80 S.Ct. 293, 4 L.Ed.2d 240, affirmed a District Court's approval of a like provision for the schools of Nashville, Tennessee. He observed that in the Kelley case we had said "[t]here is no evidence before us that the transfer plan is an evasive scheme for segregation," and that our affirmance was "on the record

before us." He pointed to evidence in the case before him that the Nashville plan had worked toward a continuance of segregation. His opinion was announced prior to our opinions in Goss v. Board of Education of City of Knoxville, Tenn., 301 F.2d 164 (C.A.6, 1962) and Maxwell v. County Board of Education of Davidson County, Tenn., 301 F.2d 828. In these cases we affirmed District Court approval of transfer plans identical in effect with the one before us here. We felt that our Kelley decision (Cert. denied) committed approval of such provisions to the discretion of the District Judge, with power to control and prevent misuse. In Goss and Maxwell we followed Kelley with the observation that "[w]e do not think the transfer provision is in and of itself illegal or unconstitutional. It is the use and application of it that may become a violation of constitutional rights. * * * We adhere to our former ruling (Kelley) with the admonition to the board that it cannot use this (the transfer privilege plan) as a means to perpetuate segregation." (301 F.2d 168).

Our Goss and Maxwell decisions have now been reversed by the Supreme Court. Goss v. Board of Education of City of Knoxville, Tennessee, et al., and Maxwell v. County Board of Education of Davidson County, Tenn., et al., 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632 (1963). The Court declares that the transfer privilege involved in the case at bar is unconstitutional and no discretion, therefore, remains in a District Judge to approve its inclusion in a plan, regardless of his control of its use.

We affirm the District Court's disapproval of the Board's Notice of Intent provision (Item V) and its Transfer Privilege (Item VI).

2. *Integration of assignment of Teachers, Principals and other School Personnel.* (Appeal No. 15038)

Prior to the commencement of this litigation and, we assume, up to taking the first step of desegregation on September 1, 1962, the City of Chattanooga

maintained a biracial (segregated) school system. Only Negro teachers and principals were assigned to the Negro schools, and only white teachers and principals were assigned to white schools.[1] The administrative staff of the school system was filled entirely by white personnel. No teachers, principals or other school personnel, Negro or white, were parties to the litigation.

The complaint averred that:

"The plaintiffs, and members of their class, are injured by the policy of assigning teachers, principals and other school personnel on the basis of the race and color of the children attending a particular school and the race and color of the person to be assigned. Assignment of school personnel on the basis of race and color is also predicated on the theory that negro teachers, negro principals and other negro school personnel are inferior to white teachers, white principals and other white school personnel and, therefore, may not teach white children."

and the prayer of the complaint asked that the Court:

"Enter a decree enjoining defendants, their agents, employees and successors from assigning teachers, principals and other school personnel to the schools of the City of Chattanooga on the basis of the race and color of the person to be assigned and on the basis of the race and color of the children attending the school to which the personnel is to be assigned."

or, in the alternative, require that any reorganization of the school system "include a plan for * * * the assignment of teachers, principals and other school personnel on a nonracial basis. * * * "

Before answering plaintiff's complaint, defendants moved the Court to strike the above quoted portions thereof. The asserted grounds for the motion were that the teachers, principals and administrative personnel were not parties to the suit nor members of the class represented by plaintiffs, that such allegations raised an immaterial issue, that failure to assign Negro teachers and principals to white schools could not affect plaintiffs' rights, and that a court could not substitute its judgment for the judgment and discretion of the school authorities in such regard "in the absence of substantial express statements of fact indicating arbitrary, capricious, fraudulent or illegal action on the part of the Superintendent of Schools or the Board of Education."

The motion to strike was granted. In his memorandum opinion on the motion, the District Judge observed:

" * * * if statements in pleadings are immaterial or impertinent, whereby they do not raise a justiciable question, and time and effort can be saved, the courts should take action.

"The question presented by the motion in this suit is whether, as an element of integration, the defendants can be enjoined from declining to employ school principals, teachers and other personnel on the sole basis of race or color."

He concluded by saying:

"In this type suit the question of failure (sic) to assign school teaching personnel on the basis of race or color cannot properly be presented."

If the Court's ruling could be considered merely as a discretionary determination that consideration of the involved question should be deferred until development of the facts, we would be inclined to find no abuse of discretion. However, under the circumstances, we must look upon the Court's order as a final decision on an important question of substantive law, and not merely a matter of procedure.

---

1. An unimportant exception was that one white language teacher taught Russian in the Negro schools and a Negro teacher was teaching by television in white schools.

█ We agree that the teachers, principals and others are not within the class represented by plaintiffs and that plaintiffs cannot assert or ask protection of some constitutional rights of the teachers and others, not parties to the cause. We, however, read the attack upon the assignment of teachers by race not as seeking to protect rights of such teachers, but as a claim that continued assigning of teaching personnel on a racial basis impairs the students' rights to an education free from any consideration of race. Neither by the first Brown decision, nor by its later decisions has the Supreme Court ruled upon the question of law presented. None of the Circuits have ruled upon the question. The case of Augustus v. Board of Public Instruction, 306 F.2d 862, 869 (C.A.5, 1962), relied on by plaintiffs is not dispositive of the question. There, the Fifth Circuit reversed a District Court's granting of a motion to strike identical allegations to those before us. It did not attempt to decide whether assignment of Negro teachers and principals to schools totally or predominantly Negro, or whether assignment of white teachers and principals to schools totally or predominantly white, offends any constitutional rights of school children. Neither did it decide that the constitution requires that the administrative personnel of a school district must contain some Negroes. It merely held that the allegations which presented such questions should be allowed to remain as part of the pleadings in the case, recognizing that in the progress of the plan of desegregation there involved, the question might indeed become moot. We consider the Fifth Circuit's ruling as a proper one, except as it relates to school personnel other than teachers and principals. We make it clear, however, that we are not passing upon the legal question presented as it relates to the assignment of teachers and principals.

In Brown & Williamson Tobacco Corp. v. United States, 201 F.2d 819, 822 (C.A. 6, 1953), we took occasion to say:

"Partly because of the practical difficulty of deciding cases without a factual record it is well established that the action of striking a pleading should be sparingly used by the courts. Colorado Milling & Elevator Co. v. Howbert, 10 Cir., 57 F.2d 769. It is a drastic remedy to be resorted to only when required for the purposes of justice. Batchelder v. Prestman, 103 Fla. 852, 138 So. 473; Collishaw v. American Smelting & Refining Co., 121 Mont. 196, 190 P.2d 673. The motion to strike should be granted only when the pleading to be stricken has no possible relation to the controversy. Samuel Goldwyn, Inc., v. United Artists Corporation, D.C., 35 F.Supp. 633; Wooldridge Mfg. Co. v. R. G. La Tourneau, Inc., D.C., 79 F.Supp. 908."

Applying such principles to the matter before us, we think it appropriate that the stricken allegations of the complaint, insofar as they relate to the assignment of teachers and principals, be restored to the pleading and that decision of the legal question presented await developments in the progress of the plan approved. Nothing we have said need call for any present taking of testimony on the subject of teacher and principal assignment. Within his discretion, the District Judge may determine when, if at all, it becomes necessary to give consideration to the question under discussion. We affirm, however, the order granting the motion to strike, to the extent that it applies to allegations relating to the hiring and assignment of school personnel other than teachers and principals.

3. *Interim Unavailability of Certain Special Courses to Negroes.* (Appeal No. 15038)

The Chattanooga senior high schools, Brainerd, Chattanooga, Howard and Kirkman Technical High School, and the Chattanooga Technical Institute, will continue segregated until reached in the approved plan of desegregation— the senior high schools on September 1,

1968 and the Chattanooga Technical Institute on September 1, 1969. Segregation of these schools was by tradition and custom, rather than by zoning regulation. Howard High was attended by Negro and the others by white students. As is customary in today's high schools, curriculums are so arranged as to provide courses for those whose education will terminate at high school, as well as for those who will go on to college. In a report submitted to the District Court, the education available at Howard High School (Negro) was described as follows:

"When the new building for the Howard School was being planned, educators and citizens alike were recognizing that many advantages accrued to housing in the same plant facilities for all educational programs at the secondary level. Hence, Howard High School, as the senior division of a 1–12 program, is the only truly comprehensive school in the Chattanooga system. It provides general education, college preparation and vocational education, with a much broader selection of course offerings than either Chattanooga High or Kirkman Technical High School. It represents the type of school which many authorities recommend for all adolescents."

Notwithstanding the foregoing, the evidence disclosed that there are certain vocational training courses at Kirkman Technical High School and at Chattanooga Technical Institute which could not be had at Howard High. The reverse is also true, namely, that some of the courses at Howard High are not available at the other high schools. Federal financial support is relied on for providing vocational training courses. The Board explained that in determining which students would be given the varying vocational training, it was following the standards suggested by the Federal Administration of Vocational Education. A pertinent quote from a release by that agency is as follows:

"Admission to any vocational class should be based upon evidence that the applicant can benefit by the instruction to be given in that class and that he possesses the qualifications required for the successful utilization of the training in that given type of work. Entrance to a vocational class should be based upon those factors, the desire of the applicant for the vocational training offered, his probable ability to benefit from the instruction to be given, and his chances of securing employment in the occupation after he has secured the training."

■ Accordingly, what vocational courses were made available to Negro high school students was determined in part upon the likely opportunity of employment in that trade that a Negro boy or girl would have in the community. While we recognize the general soundness of such approach, today's effort is to widen the employment opportunities for Negroes by equipping them with skills and education that will allow them to find employment in jobs heretofore generally unavailable to Negroes. A simple illustration of what the present Chattanooga plan may permit until complete desegregation is accomplished, was brought out on the argument of this case. If, during such waiting period, two young ladies, one white and the other Negro, desired to study to become dental technicians, the white girl could obtain the needed training, but the Negro girl could not. While the plaintiffs' complaint did not allege that the quality of the teaching or curriculums of the segregated Negro schools was inferior to that provided by the white schools, the point under discussion was urged and considered and relief from such inequality could be provided under the complaint's prayer for general relief. Even though the second Brown decision, Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L. Ed. 1083, rendered permissible a time lag

in the accomplishment of complete desegregation, it did not contemplate that such time would permit the maintenance of unequal facilities. Even the "separate, but equal" plan of racial separation approved by Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256, would not have permitted such imbalance in educational opportunities. Such inequalities were ordered to be eliminated by Sweatt v. Painter, 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114; Sipuel v. Board of Regents, 332 U.S. 631, 68 S.Ct. 299, 92 L.Ed. 247; and McLaurin v. Oklahoma State Regents, 339 U.S. 637, 70 S.Ct. 851, 94 L.Ed. 1149. In Florida ex rel. Hawkins v. Board of Control, 350 U.S. 413, 76 S.Ct. 464, 100 L.Ed. 486, the Supreme Court held that the "all deliberate speed" rule of Brown did not apply to graduate schools where immediate entrance into such a school was essential to overcome inequality in opportunity for graduate study. In Goss v. Board of Education of Knoxville, 301 F.2d 164 (C.A. 6, 1962), supra (now reversed in part on other grounds, 373 U. S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632), a like question was involved. We there said:

> "Judge Taylor wisely withheld approval of the plan insofar as it denied Negro students the right to take the technical and vocational courses offered at Fulton High School. The board should, as he suggested, present within a reasonable time a plan that would permit all Negro students who desire and are qualified to have an opportunity to take the special courses of this high school." (301 F.2d at 168).

 We do not hold that the defendant Board of Education must, in all events, and forthwith, find ways of providing Negroes with every training course now obtainable in the so-called white high schools. The limitations of space, equipment, trained personnel and necessary funds may indeed disable the Board from accomplishing immediate erasure of such inequality. It must also be permitted to employ its informed judgment as to the aptitude, scholastic attainments and other qualifications of applicants, apart from race, in screening them. We issue no command or specific directives, but, under our remand, the District Judge should require the Board to make a study of the problem and within a reasonable time submit a plan that will permit Negro students to have the opportunity to take vocational training courses for which they are qualified.

In appeal No. 15039, the judgment of the District Court is affirmed. In appeal No. 15038, the cause is remanded to the District Court for further proceedings consistent with this opinion.