Jack R. HUNNICUTT et al.

v.

W. Lee BURGE et al., Defendants,

Kenneth Miller et al., Intervenors-
Defendants.

Civ. A. No. 2754.

United States District Court,
M. D. Georgia,
Macon Division.

March 22, 1973.

Manley F. Brown, Adams, O'Neal, Hemingway & Kaplan, Macon, Ga., for plaintiffs.

H. Andrew Owen, Asst. Atty. Gen., State of Georgia, Atlanta, Ga., for defendants.

Thomas M. Jackson, Macon, Ga., for intervenors-defendants.

OWENS, District Judge:

Fort Valley State College, founded originally in 1895 under the auspices of the Episcopal church as a private college for Negro students, since 1939 has been a unit of the University System of the State of Georgia. When it became a part of the University System, it was a college for Negro students. In 1949 it was "designated by the General Assembly of the State of Georgia as the land grant college for members of the colored race . . . " taking the place of Georgia State College, Savannah, Georgia, which had been the land grant college for Georgia's Negro students. 1949 Georgia Laws, p. 144. With the exception of a very few white students and a token complement of white teachers, it remains today as it was when founded— an all-Negro [1] college.

Plaintiffs [2] by their complaint seek to compel the Board of Regents [3] of the University System of Georgia to (a) desegregate this all-Negro state college and (b) institute effective measures to eliminate the inferior academic level and below standard graduation requirements that exist and are imposed by the Board of Regents at Fort Valley State College.

The prayers of the plaintiffs to desegregate this all-Negro college come some nineteen years after the Supreme Court of the United States in Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (Brown I), held that "segregation of children in public schools solely on the basis of race, even though the physical facilities and other 'tangible' factors may be equal, deprive[s] the children of the minority group of equal educational opportunities." p. 493, 74 S.Ct. p. 691. " . . . In the field of public education the doctrine of 'separate but equal' has no place. Separate educational facilities are inherently unequal . . . " p. 494, 74 S.Ct. p. 692. They also come some eighteen years after Brown v. Board of Education of Topeka, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (Brown II), and the Supreme Court's further holding that "school authorities have the primary responsibility for elucidating, assessing, and solving these problems; courts will have to consider whether the action of school authorities constitutes good faith implementation of the governing constitutional principles." p. 299, 75 S.Ct. p. 756.

The prayers of the plaintiffs to eliminate academic inferiority and below-standard graduation requirements come some twenty-three years after

1. The present student enrollment totals about 2,300, of which approximately 16 are white and the remainder are colored. Fifteen (15) of the 16 white students are enrolled in the Masters of Education program, leaving only one white student in the undergraduate program. Of the approximately 125 faculty members, about 25 are white and the remainder are colored; including faculty members the college employs about 439 persons, of whom the 25 white faculty members are the only white employees.

2. Plaintiffs, each of whom sought to proceed as a representative of a class of persons similarly situated, as defined by this court's order of October 20, 1972, fall into three groups or categories: (1) Twenty-nine of the named plaintiffs are white taxpayers and citizens of the United States and the State of Georgia who are either students or parents of students desiring to attend a racially integrated and academically improved Fort Valley State College. They represent themselves and all persons similarly situated. (2) Two of the named plaintiffs are faculty members at Fort Valley State College. They are not proceeding in this action as representatives of any class. (3) Three of the named plaintiffs are students at Fort Valley State College. They are not proceeding as representatives of any class.

3. The government, management and control of this and the twenty-seven other state colleges is vested in the defendant Board of Regents. See Article VIII, Section IV, Constitution of the State of Georgia of 1945 as informally published in Georgia Code Annotated § 2–6701 (Rev.1948).

Sweatt v. Painter, 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114 (1950), in which the Supreme Court in ordering admission of a Negro student to the University of Texas law school on account of the state's new Negro law school not being constitutionally equal to the traditions, reputation and standing of the University of Texas law school, observed that " 'Equal protection of the laws is not achieved through indiscriminate imposition of inequalities'. Shelley v. Kraemer, 334 U.S. 1, 22, 68 S.Ct. 836, 846, 92 L.Ed. 1161 [1185], 3 A.L.R.2d 441 (1948)." p. 635, 70 S.Ct. p. 850. This part of plaintiffs' prayers for relief is important since it seeks to cause the Board of Regents to create a level of academic learning that is equivalent to and in everyday parlance "as tough as" that of other units of the University System. As the Supreme Court stated in McLaurin v. Oklahoma State Regents, 339 U.S. 637, 70 S.Ct. 851, 94 L.Ed. 1149:

> "Our society grows increasingly complex, and our need for trained leaders increases correspondingly. Appellant's case represents, perhaps, the epitome of that need, for he is attempting to obtain an advanced degree in education, to become, by definition, a leader and trainer of others. Those who will come under his guidance and influence must be directly affected by the education he receives. Their own education and development will necessarily suffer to the extent that his training is unequal to that of his classmates. State-imposed restrictions which produce such inequalities cannot be sustained."

If these prayers are granted, the students of Fort Valley State College would be the primary beneficiaries because they would then be getting what it appears they unknowingly may not be getting—the good college education that they want, need and ought to have. The secondary beneficiaries would be the children who now and hereafter are enrolled in the public schools of this state. Graduation from Fort Valley State College with an education degree entitles the graduate to a certificate from the Board of Education of this state, which in effect says "you are a teacher and are qualified to teach in the public schools of Georgia." In this day of federal court imposed requirements of hiring Negro teachers throughout this state, such certificates are automatic job placement certificates. If the children—NEGRO and WHITE—of this state are to receive the quality public education that they need and are constitutionally entitled to, they must be taught by teachers who are qualified, not from possessing a piece of paper called a "teacher's certificate", but from possessing a good education and thereby knowing something to teach. To inadequately educate and thus license teachers who are not qualified to teach is to deny the equal protection of the laws to plaintiffs and all students of Georgia's public schools.

The Board of Regents responded to the desegregation prayers by stating that the Regents recognize and admit that they have the affirmative duty to desegregate this and all state colleges; further, they assert that since the Regents can't assign students to and compel them to attend a particular state college [—students apply to the college of their choice—] the Regents, by adopting a non-racial admissions policy, "an open door policy", and by encouraging the officials and faculty of this college to recruit white students and teachers, have done all they can and are legally required to do. The Regents say that their action "constitutes good faith implementation of the governing constitutional principles" of Brown I and II. They deny academic inferiority and point to the success of a small group of selected outstanding graduates to support this denial. Defendant - Intervenors — Negro students and teachers of this college—likewise deny and point to the success of selected outstanding graduates of this college.

Evidentiary hearings were held on June 22 and July 17 and 18, 1972. Additional information was subsequently

submitted by the parties by affidavit. Briefs and proposed findings of fact and conclusions of law were prepared and submitted by the parties. The Court has carefully considered the entire matter, and this now constitutes the court's findings of fact and conclusions of law. Rule 52, Federal Rules of Civil Procedure.

## JURISDICTION AND VENUE

This court has jurisdiction by virtue of 28 U.S.C. §§ 1331 and 1343(3), and 42 U.S.C § 1983. Venue lies in this judicial district, the Middle District of Georgia, and in the Macon Division thereof. 28 U.S.C. §§ 90(b)(2), 1391 (b), 1392(a), 1393(b).

## DESEGREGATION

■ In considering whether or not the defendant Board of Regents has acted in good faith to implement the governing constitutional principles of Brown I and II, and thus eliminate what was as late as January 1961 a state college operated by requirement of state law exclusively for Negro students, Holmes v. Danner, 191 F.Supp. 394, 398 (this court, 1961), the court heard many witnesses who disapprove of what they contend to be a total failure of the Regents to do anything meaningful to desegregate this college and many witnesses who approve of what the Regents and the administration and faculty have done. It would serve no useful purpose for this court to rehash and reiterate that testimony—it would only make a bad situation worse! The end result would be the same—the undisputed evidence shows, and it would still show, that the defendant Board of Regents has abdicated its legal responsibility to take affirmative action to desegregate this state college by adopting a so-called "open-door policy" and by permitting the administration and faculty of this individual college to implement this policy without direction from above. As a natural result the administration and faculty has done only what appeared to them to be necessary—they have hired twenty-five white faculty members and given them teaching and unimportant faculty committee assignments that do not put any of them in position to even attempt to change this college. This does not and cannot under any decision of the Supreme Court of the United States or the United States Court of Appeals for the Fifth Circuit constitute good faith implementation of the constitutional principles of Brown I, Brown II and subsequent decisions. The result is that Fort Valley State College today is just as it was in 1954—an all-Negro state college.

■ It is not for this court to tell the Board of Regents how to operate this college. It is for this court to tell them that in operating this college they are not exercising the responsibility that is *theirs*—the responsibility to eliminate the racial character of this state college. Lee v. Macon County, 453 F.2d 524, 527 (5th Cir. 1971). In this court's best judgment the time for the exercise of that responsibility is now. Green v. School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716. Accordingly, the defendant Board of Regents is ordered to formulate and present to this court within ninety days after this date a written plan that realistically is designed to eliminate the racial identity of this college.

## ACADEMIC INFERIORITY

The claim of the Plaintiffs (a) that Fort Valley State College is academically inferior to other institutions of the University System and (b) that as a matter of regular practice degrees are awarded by Fort Valley State College to students who have not satisfactorily completed even normal college studies, i. e. that Fort Valley State College is a "diploma mill", present the following questions:

Is Fort Valley State College academically inferior to other state institutions and does it regularly award degrees that are not earned? If so, is there a nexus—a causal connection—between this state of affairs and the

continuation of this college as an all-black institution?  If so, does this present a separate cause of action under the Fourteenth Amendment and 42 U.S.C. § 1983?

To understand Fort Valley State College it is necessary to consider it and its past.  According to a 1971 report of the Carnegie Commission on Higher Education,[4] Fort Valley State College is one of eighty-five [5] four-year colleges founded for Negroes in these United States. For most of the time that Fort Valley State College and its fellow historically black colleges have been in existence, they have been virtually the only institutions offering a college education to black citizens of these United States.  As such they have made a real contribution to the education of Negro citizens and to the betterment of the Negro race.  As such after the slightly more than 100 years since the Civil War, the average Negro citizen, unlike his then illiterate ancestors, is today literate and in position to advance educationally as far as he is capable and desirous of going.

Black students attending Fort Valley State College, and the other historically black colleges, have come from a low socioeconomic status, have been generally underprepared for college, have been educated in college to face very limited post-college opportunities, and in being educated have suffered from the inadequacy of the resources of these historically black institutions.[6]

In the words of the Carnegie Commission:

"America's colleges and universities founded for Negroes historically have been the central institutions in an isolated system of education *developed explicitly to serve the black minority.* This system was initiated late—almost a century after the nation declared its independence.  It developed slowly—as recently as 1916 there were only 64

high schools for black students in the United States and only three-fourths of them offered four years of instruction.

"The prime movers in the development of a system of education for Negroes were the colleges founded for Negroes.  When black children had no other source of elementary or high school education, the early black 'colleges'—which did not become fully collegiate before the 1900s—taught them.  When elementary and high schools for Negroes became available, these colleges provided them with teachers.  Between the 1890s and 1955, a period during which the legally sanctioned 'separate-but-equal' doctrine kept young black Americans out of many colleges with predominantly white enrollments, especially in the Deep South, the colleges founded for Negroes provided all but a very small portion of the higher education available to them.  In 1947, for instance, between 80 and 90 percent of all Negroes who had graduated from college had received their education in black institutions in Southern states.  .  .

"Because of changes that have occurred within the past 16 years, mainly after the legality of the separate-but-equal doctrine was overturned by the U. S. Supreme Court, the old premises governing relationships between colleges founded for Negroes and black Americans and between colleges founded for Negroes and other institutions of higher education have been altered drastically."  Id. pp. 5, 6. (emphasis added).

What has happened to Fort Valley State College and the other historically black colleges since the Supreme Court in 1954 decided Brown I?  Again in the words of the Carnegie Commission:

"After 1954, when the Supreme Court struck down legal barriers to

4.  "From Isolation to Mainstream, Problems of the Colleges Founded for Negroes," a report and recommendations by the Carnegie Commission on Higher Education, February 1971.

5.  According to the report there are 32 public and 53 private, historically black four year colleges in these United States.

6.  Id., pp. 21–23.

black access to predominantly white institutions, colleges and universities throughout the country made more serious efforts than ever before to expand their enrolloments of black students.

"By the 1960s, predominantly white colleges and universities were actively recruiting black students and devising programs to assist black students financially and to prepare them academically for the educational programs they would be offered. Since recruitment practices favored students with high ability, they increased the tendency of the most able black students to attend integrated, predominantly white schools in and outside the South. . . . To the degree that apparently temporary decreases in black student enrollments at Howard University, Hampton Institute, and Morehouse College between 1968 and 1969 (see Appendix, Table 1) reflected this development, even 'elite' black colleges are not exempt from the intermural brain drain. Finding themselves inexperienced in planning and administering programs for black students, formerly all-white institutions seek out able black administrators and faculty members to assist them. The departure of these men and women from black campuses leaves voids that are difficult to fill.

\*    \*    \*    \*    \*    \*

"Because their 100 years of isolation from the educational mainstream was part of the segregation of Negroes generally in America, most of these colleges and universities offered programs geared largely to the restricted opportunities believed to be available to their graduates. For the most part, graduates of Negro colleges became teachers of black children. All but 4 of 68 black four-year institutions, for which such data were provided in the tenth edition of *American Universities and Colleges,* had education departments of schools in 1966–67. These departments utilized twice as many full professors as any other discipline and half again as many associate professors.

"The emphasis on teacher education was consistent with the expectations of 52 percent of the black college graduates of the class of 1964 who believed black opportunity for employment as elementary schoolteachers to be 'on the same basis as white.' Forty-nine percent of them held such expectations for employments as high school teachers. Richard Freeman points out that opportunities for black Americans in occupations once closed to them are now opening rapidly and that students are responding to the change more rapidly than colleges are. For instance, the fraction of black men preparing for education careers dropped from 40 percent to 10 percent between 1962 and 1970.

\*    \*    \*    \*    \*    \*

"In 1964, Earl J. McGrath listed 123 institutions that in 1963–64 had predominantly black student bodies. Today 105 colleges and universities founded for Negroes report that the majority of their students are black. A significant reduction in the total occurred when Florida closed nine of its predominantly Negro public junior colleges in 1965 and integrated the student bodies of their predominantly white junior colleges. There have since been other reductions by merger or closure. Recently, there has also been rapid integration at several public black colleges, particularly in the North and Border States. Among historically black colleges, three recently reported that more than 50 percent of their students were white: Bluefield States College, 69 percent white; West Virginia State College, 73.3 percent white; and Lincoln University, Missouri, 50.8 percent white. Several other institutions may be heading on a similar course. This year, Maryland State College became a part of the University of Maryland and in doing so further reduced the number of independently operated black colleges.

"Public colleges and universities throughout the country are legally obliged to provide access to persons of all races who can meet their academic requirements. This obligation binds colleges founded for Negroes as well as other institutions. The likelihood that more (but not inevitably all) public colleges founded for Negroes will eventually have significantly multiracial student bodies is great. *There will be no disservice to black American youth in such developments* unless the transition of public institutions from predominantly black to multiracial student bodies is achieved in such a way as to reduce rather than to maintain open access of blacks to higher education opportunities. In the long run, such transformations are more defensible, both morally and on grounds of effectiveness, than are attempts to avoid desegregation by locating new public institutions in places where they will serve white students apart from a convenient, existing, adequate, and expandable public institution founded for Negroes.

"Some private colleges founded for Negroes may also acquire multiracial student bodies at some future time, but few of them now seem headed in that direction. Many of them, instead, may interpret their missions in such ways that will commit them indefinitely to the service of predominantly black student bodies." Id. at pp. 6–9.

In the light of this background and analysis, what is the educational picture today at this college? Does it still exist explicitly to serve the black minority?

The evidence shows that all students making application to enter any of the twenty-eight institutions of the University System of Georgia must have already taken the Scholastic Aptitude Test (SAT) which is designed by and administered nationally under the direction of Educational Testing Service, Princeton, New Jersey, and Berkley, California. The test is given in two parts—verbal and math. The highest possible score on each part is 800 and the highest total score for both parts is 1600. Any student who takes the exam is given a minimum score of 200 on each part, so the lowest possible total score is 400. Figures prepared by the defendant Board of Regents show the composite mean SAT score for all freshmen entering the University System and each of its institutions. Mean, according to Webster's New International Dictionary, 2d ed., describes the "average; having an intermediate value between two extremes; as, *mean* distance; *mean* motion." Five year figures being about the same for each year, the court will refer only to the latest figures—1970–71. They show:

UNIVERSITY SYSTEM OF GEORGIA

ENTERING FRESHMEN CLASSES
COMPOSITE MEAN SCHOLASTIC
APTITUDE TEST SCORE

*1970–71*

| | |
|---|---|
| University System (as a whole) | 887 |
| Georgia Institute of Technology | 1179 |
| Southern Technical Institute | 877 |
| Georgia State University | 937 |
| Medical College of Georgia | 964 |
| University of Georgia | 1037 |
| Albany State College | 607 |
| Armstrong State College | 867 |
| Augusta College | 912 |
| Columbus College | 850 |
| *Fort Valley State College* | *575* |
| Georgia College | 905 |
| Georgia Southern College | 899 |
| Georgia Southwestern College | 803 |
| North Georgia College | 947 |
| Savannah State College | 599 |
| Valdosta State College | 864 |
| West Georgia College | 850 |
| Abraham Baldwin Agric. College | 803 |
| Albany Junior College | 803 |
| Brunswick Junior College | 808 |
| Clayton Junior College | 857 |
| Dalton Junior College | 780 |
| Floyd Junior College | 747 |
| Gainesville Junior College | 803 |

| | | | |
|---|---|---|---|
| Kennesaw Junior College | 881 | Middle Georgia College | 822 |
| Macon Junior College | 837 | South Georgia College | 789 |

As to the extremes the evidence in graph form for 20 of the 28 units show:

UNIVERSITY SYSTEM INSTITUTIONS WITH COMPOSITE MEAN BELOW UNIVERSITY SYSTEM MEAN

UNIVERSITY SYSTEM OF GEORGIA
Mean and Range of Composite
SAT Scores For
Entering Freshmen
1970-71

This excludes eight units not considered by defendants to be a fair comparison. The court notes that the 20 units on the graph are all "below the mean" schools and that if the "above the mean" schools were included, Fort Valley State College's position would look even worse. This indicates that of the 28 institutions of the University System, students entering Fort Valley State College have the lowest mean SAT score in the entire University System and on the upper limit side are also the lowest in the above graphed group and probably in the entire system. If the test is valid, it indicates that there is a concentration at this college of entering students having low SAT scores and thus less potential for doing college level work.

Defendants and critics charge that the SAT is "culturally biased" against members of minority groups and the poor [7] and, therefore, not a fair measure when applied to Fort Valley State College. Plaintiffs' expert witness, Dr. Maffeo of Mercer University, stated that the SAT is best used in "screening out the obviously unsuited rather than predicting how well a person will do." p. 122 of trial transcript. It does not predict how well a person will do because it can't measure motivation or desire and willingness to work.

Throughout the University System the determination of requirements for entering students is delegated by the defendant Board of Regents to the administration and faculty of each institution. The administration and faculty of Fort Valley State College do not use the SAT; instead they rely almost totally on the prospective student's high school grade average.

On account of its policy of admitting poorly prepared students to college and of permitting them to pursue remedial courses, and of the resulting lack of a normal time at which students can be expected to have completed the first two years of college, the Board of Regents several years ago began developing a test to be administered throughout the University System to all students who are supposed to be ready to enter the junior year of college. It is called the "Rising Junior Test." As described by Dr. Thomas F. McDonald, Director of Admission and Testing for defendant Board of Regents:

"The purpose of this test is to aid in the identification of students that display deficiencies and/or weaknesses in the two most important intellectual skills, reading and writing. After the student is identified he is informed of his deficiencies and afforded opportunities to correct and improve these skills through specially designed programs of instruction and counseling.

\* \* \* \* \* \*

"The Rising Junior Test has three components: (1) Writing, (2) Reading, and (3) an Essay.

"The Writing section is an objective measure designed to assess skills in diction, sentence structure, spelling, punctuation, usage and vocabulary. Performance is reported in the form of a scaled score on a scale with values ranging from 1 to 99.

"The Reading section is an objective measure designed to assess skills in identifying ideas, inferences analysis, synthesis, and critical thinking. Performance is reported in the form of a scaled score on a scale with values ranging from 1 to 99.

"The Essay is a free-writing exercise on a pre-selected topic of a general nature and requires no specific or technical knowledge. The student is graded on his skills in conveying his ideas through usage, sentence correctness and paragraph organization. Performance is reported in the form of a scaled score on a scale with value from 1 to 4." (Defendants' Exhibit 11).

The court at its request was furnished with the overall results as to students

7. "College Entrance Test: Biased and Burdensome or a Real Opportunity?" The Wall Street Journal, September 5, 1972.

taking the Rising Junior Tests at each institution of the University System, D–11. That information as supplemented shows that the following percentages of Fort Valley students *passed* this test:

| FORT VALLEY STATE COLLEGE | WRITING | READING |
|---|---|---|
| Winter 1972 | 28% | 34% |
| Spring 1972 | 21% | 20% |
| Summer 1972 | 13% | 20% |
| Fall 1972 | 24% | 32% |
| Winter 1973 | 36% | 33%, as |

compared to the University System as a whole as demonstrated by the test results for Spring 1971–72:

SYSTEM SUMMARY REPORT

DATE OF TEST ADMINISTRATION: SPRING 1971–72

NUMBER OF STUDENTS TESTED AND PERCENTAGE OF STUDENTS DEMONSTRATING COMPETENCE.

| INSTITUTION | NUMBER | WRITING | READING |
|---|---|---|---|
| GEORGIA TECH | 254 | 99.21 | 98.43 |
| SOUTHERN TECH | 85 | 92.94 | 91.76 |
| GEORGIA STATE | 603 | 98.67 | 96.35 |
| UNIVERSITY OF GA. | 1339 | 99.18 | 98.95 |
| ALBANY STATE | 114 | 43.86 | 33.33 |
| ARMSTRONG STATE | 29 | 89.66 | 93.10 |
| AUGUSTA COLLEGE | 133 | 95.49 | 96.99 |
| COLUMBUS COLLEGE | 116 | 93.97 | 90.52 |
| FORT VALLEY STATE | 66 | 25.76 | 19.70 |
| GEORGIA COLLEGE | 57 | 96.49 | 91.23 |
| GEORGIA SOUTHERN | 165 | 93.94 | 92.73 |
| GA. SOUTHWESTERN | 135 | 91.85 | 89.63 |
| NORTH GEORGIA | 63 | 100.00 | 98.41 |
| SAVANNAH STATE | 131 | 48.09 | 28.24 |
| VALDOSTA STATE | 96 | 95.83 | 91.67 |
| WEST GEORGIA | 203 | 94.58 | 92.61 |
| ABRAHAM BALDWIN | 108 | 84.26 | 80.56 |
| ALBANY JUNIOR | 63 | 90.48 | 90.48 |
| BRUNSWICK JUNIOR | 51 | 84.31 | 86.27 |
| CLAYTON JUNIOR | 78 | 88.46 | 89.74 |
| DALTON JUNIOR | 76 | 82.89 | 75.00 |
| FLOYD JUNIOR | 42 | 100.00 | 97.62 |
| GAINESVILLE JUNIOR | 98 | 96.94 | 94.90 |
| KENNESAW JUNIOR | 60 | 98.33 | 98.33 |
| MACON JUNIOR | 74 | 97.30 | 94.59 |
| MIDDLE GEORGIA | 100 | 85.00 | 92.00 |
| SOUTH GEORGIA | 66 | 92.42 | 86.36 |
| TOTAL SYSTEM | 4405 | 92.26 | 90.22 |

While this case has been pending, the defendant Board of Regents [8] had adopted a new regulation requiring all students throughout the University System to pass the Rising Junior Test as a condition precedent to graduation. The Rising Junior Test requires each college student to demonstrate basic competence in the fundamental skills of reading and writing. It does not appear to be subject to possible attacks of cultural bias. It also indicates that at Fort Valley State College there is a concentration of poorly prepared students.

Fort Valley State College teachers testified that generally students enrolled at Fort Valley State College do not perform at a minimum college level. The Rising Junior Test confirms this. This does not mean that they cannot if they first prepare themselves. It does not mean that there are not capable students at Fort Valley—the court is aware and most appreciative of the small group of Fort Valley graduates who have demonstrated their receipt of a good education by succeeding at higher educational levels and in important roles in the tough world that we all live in. At the same time the court cannot help but wonder whether or not that group of successful graduates if they had been educated at Fort Valley College with other better prepared students, would not have received even better educations and been even more successful.

Some of the faculty of Fort Valley State College conscientiously believe that they can assist Negro students and better the Negro citizens of this country, by helping as many Negro students as possible get a college degree without regards to whether or not it has really been earned or prepares them to do anything. Booker T. Washington, the eminent Negro educator, in his autobiography "Up From Slavery" told of being urged to do other than give his people a good basic education that would prepare them to be competitive, useful citizens, and of how he resisted the well meaning people who so urged him and instead, worked tirelessly to give his people such a good education. Well-meaning educators

8. The Atlanta Constitution, Thursday, November 9, 1972, p. 16–C.

of today would do well to read "Up From Slavery" to better understand that to give Negro students what does not prepare them and what they do not really earn is doing them an injustice. As was reported in 1967 by the Commission on Higher Educational Opportunity in the South: ". . . In American society, a college degree is a badge of preparedness, but some graduates of Negro colleges have found it is a *hollow symbol* because their preparation has been inadequate." [9]

The May 1971 catalog of Fort Valley State College shows that while the following degrees are offered:

Bachelor of Arts
  Economics
  English
  History and Political Science
  Sociology
  Social Welfare

Bachelor of Business Administration
  Accounting
  General Business
  Management

Bachelor of Science
  Botany
  Business Administration
  Chemistry
  Mathematics
  Secretarial Science
  Zoology

Bachelor of Science in Agriculture
  Agricultural Education
  Animal Science
  Plant Science

Bachelor of Science in Business Education
  Elementary Education
  Secondary Education
  Biology
  Chemistry
  English
  French
  Health and Physical Education
  Mathematics

Science
Social Science

Bachelor of Science in Home Economics
  Home Economics Education
  Food and Nutrition

Bachelor of Science in Music Education

Bachelor of Science in Elementary Education

Master of Science in Counseling and Guidance

the majority of undergradutes have been receiving the degree of Bachelor of Science in Education. That same catalog indicates that the degree of Master of Science in Elementary Education was awarded to students whose thesis titles were such as:

(1) "The Results of Special Reading Readiness Experiences of Middle Class Children and Disadvantaged Children After Eight Weeks of Instruction";

(2) "The Effectiveness of Two Approaches to the Teaching of Reading in the Fourth Grade";

(3) "Teaching Social Studies With and Without Television to Fifth Graders". pp. 272, 273.

The Court has considered these facts in the light of the great debate among educators as to the validity of the belief that has persisted in this country since the days of Thomas Jefferson, that education is a means of achieving equality in our society. See Do Schools Make a Difference"? The Atlantic Monthly, March 1973, p. 35. Regardless of the validity of the growing modern belief that education is not a means of achieving equality in our society, the Supreme Court in Brown I decided legally that education is a means of achieving equality in our society. It is not for this court to reexamine that finding.

As the Carnegie Commission pointed out, the program of historically black in-

9. "The Negro and Higher Education in the South", a statement by the Commission on Higher Educational Opportunity in the South, August 1967, p. 5.

stitutions, including that of Fort Valley State College, was designed "explicitly to serve the black minority." The Supreme Court by holding in Brown I that separate educational facilities are inherently unequal in reality held as a matter of law that educational programs designed explicitly for the black minority, and thus designed to attract just the black minority, are inherently unequal.

██ The evidence in this case demonstrates that not only is the program of Fort Valley State College legally inherently unequal, but also in truth and fact the program of this college was and is designed explicitly to serve Negro students and to attract just Negro students and, thus, is factually unequal. It is academically inferior to the educational programs of other state institutions and as is demonstrated by the evidence, including particularly the lack of success of third year Fort Valley State College students on the "Rising Junior Test", and by the subject matter of the thesis topics of those who earned masters' degrees, it does regularly award degrees that are not really earned. Its give-away program and its black student body and faculty naturally attract black students who are unprepared for the real college contest. It is a substantial, definite cause of the continuation of this state college as an all-black institution. There is a nexus between this state of affairs and the all-black racial identity of this college.[10] That nexus must be broken if Fort Valley State College is to ever lose its racial identity. Accordingly, in formulating and presenting its written plan to this court, the defendant Board of Regents shall also include specific proposals to break this nexus, to revise and

change the educational program of Fort Valley State College so as to eliminate this design for black students.

All that is said herein is not to be construed by anyone as a finding by this court or an opinion of this court that the present state of this college results from the intentional, evil designs of anyone—it obviously flows from the benign neglect of those who do not wish to disturb or change an old but outmoded institution. Nevertheless, change we must!

At such time as the written plans to be filed by the defendant Board of Regents have been filed with the court and served upon opposing counsel, this case will be set down for further consideration.

---

10. Having decided that there is a nexus between the designed for blacks educational program and the continued all-black racial identity of this college, it is unnecessary to consider whether or not the continuation of this program is properly a separate cause of action under the Fourteenth Amendment and 42 U.S.C. § 1983.

To properly decide that issue it would be necessary to hold additional eviden-

tiary hearings as to what at present appears to be a course of conduct of the defendant Board of Regents and administrators of this college that amounts to the invidious, purposeful discrimination that constitutes a denial of the equal protection of the laws. Snowden v. Hughes, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497.